Justice KENNEDYdelivered the opinion of the Court.
The underlying dispute in this case concerns where housing for low-income persons should be constructed in Dallas, Texas-that is, whether the housing should be built in the inner city or in the suburbs. This dispute comes to the Court on a disparate-impact theory of liability. In contrast to a disparate-treatment case, where a "plaintiff must establish that the defendant had a discriminatory intent or motive," a plaintiff bringing a disparate-impact claim challenges practices that have a "disproportionately adverse effect on minorities" and are otherwise unjustified by a legitimate rationale. Ricci v. DeStefano,557 U.S. 557, 577, 129 S.Ct. 2658, 174 L.Ed.2d 490 (2009)(internal quotation marks omitted). The question presented for the Court's determination is whether disparate-impact claims are cognizable under the Fair Housing Act (or FHA), 82 Stat. 81, as amended, 42 U.S.C. § 3601 et seq.
I
A
Before turning to the question presented, it is necessary to discuss a different federal statute that gives rise to this dispute. The Federal Government provides low-income housing tax credits that are distributed to developers through designated state agencies. 26 U.S.C. § 42. Congress has directed States to develop plans identifying selection criteria for distributing the credits. § 42(m)(1). Those plans must include certain criteria, such as public housing waiting lists, § 42(m)(1)(C), as well as certain preferences, including that low-income housing units "contribut[e] to a concerted community revitalization plan" and be built in census tracts populated predominantly by low-income residents. §§ 42(m)(1)(B)(ii)(III), 42(d)(5)(ii)(I). Federal law thus favors the distribution of these tax credits for the development of housing units in low-income areas.
In the State of Texas these federal credits are distributed by the Texas Department of Housing and Community Affairs (Department). Under Texas law, a developer's application for the tax credits is scored under a point system that gives priority to statutory criteria, such as the financial feasibility of the development project and the income level of tenants.
*2514 Tex. Govt.Code Ann. §§ 2306.6710(a)-(b)(West 2008). The Texas Attorney General has interpreted state law to permit the consideration of additional criteria, such as whether the housing units will be built in a neighborhood with good schools. Those criteria cannot be awarded more points than statutorily mandated criteria. Tex. Op. Atty. Gen. No. GA-0208, pp. 2-6 (2004), 2004 WL 1434796, *4-*6.
The Inclusive Communities Project, Inc. (ICP), is a Texas-based nonprofit corporation that assists low-income families in obtaining affordable housing. In 2008, the ICP brought this suit against the Department and its officers in the United States District Court for the Northern District of Texas. As relevant here, it brought a disparate-impact claim under §§ 804(a) and 805(a) of the FHA. The ICP alleged the Department has caused continued segregated housing patterns by its disproportionate allocation of the tax credits, granting too many credits for housing in predominantly black inner-city areas and too few in predominantly white suburban neighborhoods. The ICP contended that the Department must modify its selection criteria in order to encourage the construction of low-income housing in suburban communities.
The District Court concluded that the ICP had established a prima facie case of disparate impact. It relied on two pieces of statistical evidence. First, it found "from 1999-2008, [the Department] approved tax credits for 49.7% of proposed non-elderly units in 0% to 9.9% Caucasian areas, but only approved 37.4% of proposed non-elderly units in 90% to 100% Caucasian areas." 749 F.Supp.2d 486, 499 (N.D.Tex.2010)(footnote omitted). Second, it found "92.29% of [low-income housing tax credit] units in the city of Dallas were located in census tracts with less than 50% Caucasian residents." Ibid.
The District Court then placed the burden on the Department to rebut the ICP's prima facie showing of disparate impact. 860 F.Supp.2d 312, 322-323 (2012). After assuming the Department's proffered interests were legitimate, id.,at 326, the District Court held that a defendant-here the Department-must prove "that there are no other less discriminatory alternatives to advancing their proffered interests," ibid.Because, in its view, the Department "failed to meet [its] burden of proving that there are no less discriminatory alternatives," the District Court ruled for the ICP. Id.,at 331.
The District Court's remedial order required the addition of new selection criteria for the tax credits. For instance, it awarded points for units built in neighborhoods with good schools and disqualified sites that are located adjacent to or near hazardous conditions, such as high crime areas or landfills. See 2012 WL 3201401 (Aug. 7, 2012). The remedial order contained no explicit racial targets or quotas.
While the Department's appeal was pending, the Secretary of Housing and Urban Development (HUD) issued a regulation interpreting the FHA to encompass disparate-impact liability. See Implementation of the Fair Housing Act's Discriminatory Effects Standard, 78 Fed.Reg. 11460 (2013). The regulation also established a burden-shifting framework for adjudicating disparate-impact claims. Under the regulation, a plaintiff first must make a prima facie showing of disparate impact. That is, the plaintiff "has the burden of proving that a challenged practice caused or predictably will cause a discriminatory effect." 24 CFR § 100.500(c)(1) (2014). If a statistical discrepancy is caused by factors other than the defendant's policy, a plaintiff cannot establish a prima facie case, and there is no liability. After a plaintiff does establish a prima facie showing *2515 of disparate impact, the burden shifts to the defendant to "prov[e] that the challenged practice is necessary to achieve one or more substantial, legitimate, nondiscriminatory interests." § 100.500(c)(2). HUD has clarified that this step of the analysis "is analogous to the Title VII requirement that an employer's interest in an employment practice with a disparate impact be job related." 78 Fed.Reg. 11470. Once a defendant has satisfied its burden at step two, a plaintiff may "prevail upon proving that the substantial, legitimate, nondiscriminatory interests supporting the challenged practice could be served by another practice that has a less discriminatory effect." § 100.500(c)(3).
The Court of Appeals for the Fifth Circuit held, consistent with its precedent, that disparate-impact claims are cognizable under the FHA. 747 F.3d 275, 280 (2014). On the merits, however, the Court of Appeals reversed and remanded. Relying on HUD's regulation, the Court of Appeals held that it was improper for the District Court to have placed the burden on the Department to prove there were no less discriminatory alternatives for allocating low-income housing tax credits. Id., at 282-283. In a concurring opinion, Judge Jones stated that on remand the District Court should reexamine whether the ICP had made out a prima facie case of disparate impact. She suggested the District Court incorrectly relied on bare statistical evidence without engaging in any analysis about causation. She further observed that, if the federal law providing for the distribution of low-income housing tax credits ties the Department's hands to such an extent that it lacks a meaningful choice, then there is no disparate-impact liability. See id.,at 283-284(specially concurring opinion).
The Department filed a petition for a writ of certiorari on the question whether disparate-impact claims are cognizable under the FHA. The question was one of first impression, see Huntington v. Huntington Branch, NAACP,488 U.S. 15, 109 S.Ct. 276, 102 L.Ed.2d 180 (1988)(per curiam), and certiorari followed, 573 U.S. ----, 135 S.Ct. 46, 189 L.Ed.2d 896 (2014). It is now appropriate to provide a brief history of the FHA's enactment and its later amendment.
B
De jureresidential segregation by race was declared unconstitutional almost a century ago, Buchanan v. Warley,245 U.S. 60, 38 S.Ct. 16, 62 L.Ed. 149 (1917), but its vestiges remain today, intertwined with the country's economic and social life. Some segregated housing patterns can be traced to conditions that arose in the mid-20th century. Rapid urbanization, concomitant with the rise of suburban developments accessible by car, led many white families to leave the inner cities. This often left minority families concentrated in the center of the Nation's cities. During this time, various practices were followed, sometimes with governmental support, to encourage and maintain the separation of the races: Racially restrictive covenants prevented the conveyance of property to minorities, see Shelley v. Kraemer,334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161 (1948); steering by real-estate agents led potential buyers to consider homes in racially homogenous areas; and discriminatory lending practices, often referred to as redlining, precluded minority families from purchasing homes in affluent areas. See, e.g., M. Klarman, Unfinished Business: Racial Equality in American History 140-141 (2007); Brief for Housing Scholars as Amici Curiae22-23. By the 1960's, these policies, practices, and prejudices had created many predominantly black inner cities surrounded by mostly white suburbs.
*2516 See K. Clark, Dark Ghetto: Dilemmas of Social Power 11, 21-26 (1965).
The mid-1960's was a period of considerable social unrest; and, in response, President Lyndon Johnson established the National Advisory Commission on Civil Disorders, commonly known as the Kerner Commission. Exec. Order No. 11365, 3 CFR 674 (1966-1970 Comp.). After extensive factfinding the Commission identified residential segregation and unequal housing and economic conditions in the inner cities as significant, underlying causes of the social unrest. See Report of the National Advisory Commission on Civil Disorders 91 (1968) (Kerner Commission Report). The Commission found that "[n]early two-thirds of all nonwhite families living in the central cities today live in neighborhoods marked by substandard housing and general urban blight." Id.,at 13. The Commission further found that both open and covert racial discrimination prevented black families from obtaining better housing and moving to integrated communities. Ibid.The Commission concluded that "[o]ur Nation is moving toward two societies, one black, one white-separate and unequal." Id.,at 1. To reverse "[t]his deepening racial division," ibid.,it recommended enactment of "a comprehensive and enforceable open-occupancy law making it an offense to discriminate in the sale or rental of any housing ... on the basis of race, creed, color, or national origin." Id.,at 263.
In April 1968, Dr. Martin Luther King, Jr., was assassinated in Memphis, Tennessee, and the Nation faced a new urgency to resolve the social unrest in the inner cities. Congress responded by adopting the Kerner Commission's recommendation and passing the Fair Housing Act. The statute addressed the denial of housing opportunities on the basis of "race, color, religion, or national origin." Civil Rights Act of 1968, § 804, 82 Stat. 83. Then, in 1988, Congress amended the FHA. Among other provisions, it created certain exemptions from liability and added "familial status" as a protected characteristic. See Fair Housing Amendments Act of 1988, 102 Stat. 1619.
II
The issue here is whether, under a proper interpretation of the FHA, housing decisions with a disparate impact are prohibited. Before turning to the FHA, however, it is necessary to consider two other antidiscrimination statutes that preceded it.
The first relevant statute is § 703(a) of Title VII of the Civil Rights Act of 1964, 78 Stat. 255. The Court addressed the concept of disparate impact under this statute in Griggs v. Duke Power Co.,401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). There, the employer had a policy requiring its manual laborers to possess a high school diploma and to obtain satisfactory scores on two intelligence tests. The Court of Appeals held the employer had not adopted these job requirements for a racially discriminatory purpose, and the plaintiffs did not challenge that holding in this Court. Instead, the plaintiffs argued § 703(a)(2) covers the discriminatory effect of a practice as well as the motivation behind the practice. Section 703(a), as amended, provides as follows:
"It shall be an unlawful employer practice for an employer-
"(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or
"(2) to limit, segregate, or classify his employees or applicants for employment *2517 in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a).
The Court did not quote or cite the full statute, but rather relied solely on § 703(a)(2). Griggs,401 U.S., at 426, n. 1, 91 S.Ct. 849.
In interpreting § 703(a)(2), the Court reasoned that disparate-impact liability furthered the purpose and design of the statute. The Court explained that, in § 703(a)(2), Congress "proscribe[d] not only overt discrimination but also practices that are fair in form, but discriminatory in operation." Id.,at 431, 91 S.Ct. 849. For that reason, as the Court noted, "Congress directed the thrust of [§ 703(a)(2) ] to the consequences of employment practices, not simply the motivation." Id.,at 432, 91 S.Ct. 849. In light of the statute's goal of achieving "equality of employment opportunities and remov[ing] barriers that have operated in the past" to favor some races over others, the Court held § 703(a)(2) of Title VII must be interpreted to allow disparate-impact claims. Id.,at 429-430, 91 S.Ct. 849.
The Court put important limits on its holding: namely, not all employment practices causing a disparate impact impose liability under § 703(a)(2). In this respect, the Court held that "business necessity" constitutes a defense to disparate-impact claims. Id.,at 431, 91 S.Ct. 849. This rule provides, for example, that in a disparate-impact case, § 703(a)(2) does not prohibit hiring criteria with a "manifest relationship" to job performance. Id.,at 432, 91 S.Ct. 849; see also Ricci,557 U.S., at 587-589, 129 S.Ct. 2658(emphasizing the importance of the business necessity defense to disparate-impact liability). On the facts before it, the Court in Griggsfound a violation of Title VII because the employer could not establish that high school diplomas and general intelligence tests were related to the job performance of its manual laborers. See 401 U.S., at 431-432, 91 S.Ct. 849.
The second relevant statute that bears on the proper interpretation of the FHA is the Age Discrimination in Employment Act of 1967 (ADEA), 81 Stat. 602 et seq.,as amended. Section 4(a) of the ADEA provides:
"It shall be unlawful for an employer-
"(1) to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age;
"(2) to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's age; or
"(3) to reduce the wage rate of any employee in order to comply with this chapter." 29 U.S.C. § 623(a).
The Court first addressed whether this provision allows disparate-impact claims in Smith v. City of Jackson,544 U.S. 228, 125 S.Ct. 1536, 161 L.Ed.2d 410 (2005). There, a group of older employees challenged their employer's decision to give proportionately greater raises to employees with less than five years of experience.
Explaining that Griggs"represented the better reading of [Title VII's] statutory text," 544 U.S., at 235, 125 S.Ct. 1536a plurality of the Court concluded that the same reasoning pertained to § 4(a)(2) of the ADEA. The Smithplurality emphasized that both § 703(a)(2) of Title VII and § 4(a)(2) of the ADEA contain language *2518 "prohibit[ing] such actions that 'deprive any individual of employment opportunities or otherwise adversely affecthis status as an employee, because of such individual's' race or age." 544 U.S., at 235, 125 S.Ct. 1536. As the plurality observed, the text of these provisions "focuses on the effectsof the action on the employee rather than the motivation for the action of the employer" and therefore compels recognition of disparate-impact liability. Id.,at 236, 125 S.Ct. 1536. In a separate opinion, Justice SCALIA found the ADEA's text ambiguous and thus deferred under Chevron, U.S.A. Inc. v. Natural Resources Defense Council, Inc.,467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), to an Equal Employment Opportunity Commission regulation interpreting the ADEA to impose disparate-impact liability, see 544 U.S., at 243-247, 125 S.Ct. 1536(opinion concurring in part and concurring in judgment).
Together, Griggsholds and the plurality in Smithinstructs that antidiscrimination laws must be construed to encompass disparate-impact claims when their text refers to the consequences of actions and not just to the mindset of actors, and where that interpretation is consistent with statutory purpose. These cases also teach that disparate-impact liability must be limited so employers and other regulated entities are able to make the practical business choices and profit-related decisions that sustain a vibrant and dynamic free-enterprise system. And before rejecting a business justification-or, in the case of a governmental entity, an analogous public interest-a court must determine that a plaintiff has shown that there is "an available alternative ... practice that has less disparate impact and serves the [entity's] legitimate needs." Ricci, supra,at 578, 129 S.Ct. 2658. The cases interpreting Title VII and the ADEA provide essential background and instruction in the case now before the Court.
Turning to the FHA, the ICP relies on two provisions. Section 804(a) provides that it shall be unlawful:
"To refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin." 42 U.S.C. § 3604(a).
Here, the phrase "otherwise make unavailable" is of central importance to the analysis that follows.
Section 805(a), in turn, provides:
"It shall be unlawful for any person or other entity whose business includes engaging in real estate-related transactions to discriminate against any person in making available such a transaction, or in the terms or conditions of such a transaction, because of race, color, religion, sex, handicap, familial status, or national origin." § 3605(a).
Applied here, the logic of Griggsand Smithprovides strong support for the conclusion that the FHA encompasses disparate-impact claims. Congress' use of the phrase "otherwise make unavailable" refers to the consequences of an action rather than the actor's intent. See United States v. Giles,300 U.S. 41, 48, 57 S.Ct. 340, 81 L.Ed. 493 (1937)(explaining that the "word 'make' has many meanings, among them '[t]o cause to exist, appear or occur' " (quoting Webster's New International Dictionary 1485 (2d ed. 1934))). This results-oriented language counsels in favor of recognizing disparate-impact liability. See Smith, supra,at 236, 125 S.Ct. 1536. The Court has construed statutory language similar to § 805(a) to include disparate-impact liability. See, e.g.,Board of Ed. of City School Dist. of New York v.
*2519 Harris,444 U.S. 130, 140-141, 100 S.Ct. 363, 62 L.Ed.2d 275 (1979)(holding the term "discriminat[e]" encompassed disparate-impact liability in the context of a statute's text, history, purpose, and structure).
A comparison to the antidiscrimination statutes examined in Griggsand Smithis useful. Title VII's and the ADEA's "otherwise adversely affect" language is equivalent in function and purpose to the FHA's "otherwise make unavailable" language. In these three statutes the operative text looks to results. The relevant statutory phrases, moreover, play an identical role in the structure common to all three statutes: Located at the end of lengthy sentences that begin with prohibitions on disparate treatment, they serve as catchall phrases looking to consequences, not intent. And all three statutes use the word "otherwise" to introduce the results-oriented phrase. "Otherwise" means "in a different way or manner," thus signaling a shift in emphasis from an actor's intent to the consequences of his actions. Webster's Third New International Dictionary 1598 (1971). This similarity in text and structure is all the more compelling given that Congress passed the FHA in 1968-only four years after passing Title VII and only four months after enacting the ADEA.
It is true that Congress did not reiterate Title VII's exact language in the FHA, but that is because to do so would have made the relevant sentence awkward and unclear. A provision making it unlawful to "refuse to sell [,] ... or otherwise [adversely affect], a dwelling to any person" because of a protected trait would be grammatically obtuse, difficult to interpret, and far more expansive in scope than Congress likely intended. Congress thus chose words that serve the same purpose and bear the same basic meaning but are consistent with the structure and objectives of the FHA.
Emphasizing that the FHA uses the phrase "because of race," the Department argues this language forecloses disparate-impact liability since "[a]n action is not taken 'because of race' unless race is a reasonfor the action." Brief for Petitioners 26. Griggsand Smith,however, dispose of this argument. Both Title VII and the ADEA contain identical "because of" language, see 42 U.S.C. § 2000e-2(a)(2); 29 U.S.C. § 623(a)(2), and the Court nonetheless held those statutes impose disparate-impact liability.
In addition, it is of crucial importance that the existence of disparate-impact liability is supported by amendments to the FHA that Congress enacted in 1988. By that time, all nine Courts of Appeals to have addressed the question had concluded the Fair Housing Act encompassed disparate-impact claims. See Huntington Branch, NAACP v. Huntington,844 F.2d 926, 935-936 (C.A.2 1988); Resident Advisory Bd. v. Rizzo,564 F.2d 126, 146 (C.A.3 1977); Smith v. Clarkton,682 F.2d 1055, 1065 (C.A.4 1982); Hanson v. Veterans Administration,800 F.2d 1381, 1386 (C.A.5 1986); Arthur v. Toledo,782 F.2d 565, 574-575 (C.A.6 1986); Metropolitan Housing Development Corp. v. Arlington Heights,558 F.2d 1283, 1290 (C.A.7 1977); United States v. Black Jack,508 F.2d 1179, 1184-1185 (C.A.8 1974); Halet v. Wend Investment Co.,672 F.2d 1305, 1311 (C.A.9 1982); United States v. Marengo Cty. Comm'n,731 F.2d 1546, 1559, n. 20 (C.A.11 1984).
When it amended the FHA, Congress was aware of this unanimous precedent. And with that understanding, it made a considered judgment to retain the relevant statutory text. See H.R.Rep. No. 100-711, p. 21, n. 52(1988), 1988 U.S.C.C.A.N. 2173 (H.R. Rep.) (discussing suits premised on *2520 disparate-impact claims and related judicial precedent); 134 Cong. Rec. 23711 (1988) (statement of Sen. Kennedy) (noting unanimity of Federal Courts of Appeals concerning disparate impact); Fair Housing Amendments Act of 1987: Hearings on S. 558 before the Subcommittee on the Constitution of the Senate Committee on the Judiciary, 100th Cong., 1st Sess., 529 (1987) (testimony of Professor Robert Schwemm) (describing consensus judicial view that the FHA imposed disparate-impact liability). Indeed, Congress rejected a proposed amendment that would have eliminated disparate-impact liability for certain zoning decisions. See H.R. Rep., at 89-93.
Against this background understanding in the legal and regulatory system, Congress' decision in 1988 to amend the FHA while still adhering to the operative language in §§ 804(a) and 805(a) is convincing support for the conclusion that Congress accepted and ratified the unanimous holdings of the Courts of Appeals finding disparate-impact liability. "If a word or phrase has been ... given a uniform interpretation by inferior courts ..., a later version of that act perpetuating the wording is presumed to carry forward that interpretation." A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts 322 (2012); see also Forest Grove School Dist. v. T.A.,557 U.S. 230, 244, n. 11, 129 S.Ct. 2484, 174 L.Ed.2d 168 (2009)("When Congress amended [the Act] without altering the text of [the relevant provision], it implicitly adopted [this Court's] construction of the statute"); Manhattan Properties, Inc. v. Irving Trust Co.,291 U.S. 320, 336, 54 S.Ct. 385, 78 L.Ed. 824 (1934)(explaining, where the Courts of Appeals had reached a consensus interpretation of the Bankruptcy Act and Congress had amended the Act without changing the relevant provision, "[t]his is persuasive that the construction adopted by the [lower federal] courts has been acceptable to the legislative arm of the government").
Further and convincing confirmation of Congress' understanding that disparate-impact liability exists under the FHA is revealed by the substance of the 1988 amendments. The amendments included three exemptions from liability that assume the existence of disparate-impact claims. The most logical conclusion is that the three amendments were deemed necessary because Congress presupposed disparate impact under the FHA as it had been enacted in 1968.
The relevant 1988 amendments were as follows. First, Congress added a clarifying provision: "Nothing in [the FHA] prohibits a person engaged in the business of furnishing appraisals of real property to take into consideration factors other than race, color, religion, national origin, sex, handicap, or familial status." 42 U.S.C. § 3605(c). Second, Congress provided: "Nothing in [the FHA] prohibits conduct against a person because such person has been convicted by any court of competent jurisdiction of the illegal manufacture or distribution of a controlled substance." § 3607(b)(4). And finally, Congress specified: "Nothing in [the FHA] limits the applicability of any reasonable ... restrictions regarding the maximum number of occupants permitted to occupy a dwelling." § 3607(b)(1).
The exemptions embodied in these amendments would be superfluous if Congress had assumed that disparate-impact liability did not exist under the FHA. See Gustafson v. Alloyd Co.,513 U.S. 561, 574, 115 S.Ct. 1061, 131 L.Ed.2d 1 (1995)("[T]he Court will avoid a reading which renders some words altogether redundant"). Indeed, none of these amendments would make sense if the FHA encompassed only disparate-treatment *2521 claims. If that were the sole ground for liability, the amendments merely restate black-letter law. If an actor makes a decision based on reasons other than a protected category, there is no disparate-treatment liability. See, e.g., Texas Dept. of Community Affairs v. Burdine,450 U.S. 248, 254, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). But the amendments do constrain disparate-impact liability. For instance, certain criminal convictions are correlated with sex and race. See, e.g., Kimbrough v. United States,552 U.S. 85, 98, 128 S.Ct. 558, 169 L.Ed.2d 481 (2007)(discussing the racial disparity in convictions for crack cocaine offenses). By adding an exemption from liability for exclusionary practices aimed at individuals with drug convictions, Congress ensured disparate-impact liability would not lie if a landlord excluded tenants with such convictions. The same is true of the provision allowing for reasonable restrictions on occupancy. And the exemption from liability for real-estate appraisers is in the same section as § 805(a)'s prohibition of discriminatory practices in real-estate transactions, thus indicating Congress' recognition that disparate-impact liability arose under § 805(a). In short, the 1988 amendments signal that Congress ratified disparate-impact liability.
A comparison to Smith's discussion of the ADEA further demonstrates why the Department's interpretation would render the 1988 amendments superfluous. Under the ADEA's reasonable-factor-other-than-age (RFOA) provision, an employer is permitted to take an otherwise prohibited action where "the differentiation is based on reasonable factors other than age." 29 U.S.C. § 623(f)(1). In other words, if an employer makes a decision based on a reasonable factor other than age, it cannot be said to have made a decision on the basis of an employee's age. According to the Smithplurality, the RFOA provision "plays its principal role" "in cases involving disparate-impact claims" "by precluding liability if the adverse impact was attributable to a nonage factor that was 'reasonable.' " 544 U.S., at 239, 125 S.Ct. 1536. The plurality thus reasoned that the RFOA provision would be "simply unnecessary to avoid liability under the ADEA" if liability were limited to disparate-treatment claims. Id.,at 238, 125 S.Ct. 1536.
A similar logic applies here. If a real-estate appraiser took into account a neighborhood's schools, one could not say the appraiser acted because of race. And by embedding 42 U.S.C. § 3605(c)'s exemption in the statutory text, Congress ensured that disparate-impact liability would not be allowed either. Indeed, the inference of disparate-impact liability is even stronger here than it was in Smith. As originally enacted, the ADEA included the RFOA provision, see § 4(f)(1), 81 Stat. 603, whereas here Congress added the relevant exemptions in the 1988 amendments against the backdrop of the uniform view of the Courts of Appeals that the FHA imposed disparate-impact liability.
Recognition of disparate-impact claims is consistent with the FHA's central purpose. See Smith, supra,at 235, 125 S.Ct. 1536(plurality opinion); Griggs,401 U.S., at 432, 91 S.Ct. 849. The FHA, like Title VII and the ADEA, was enacted to eradicate discriminatory practices within a sector of our Nation's economy. See 42 U.S.C. § 3601("It is the policy of the United States to provide, within constitutional limitations, for fair housing throughout the United States"); H.R. Rep., at 15 (explaining the FHA "provides a clear national policy against discrimination in housing").
These unlawful practices include zoning laws and other housing restrictions *2522 that function unfairly to exclude minorities from certain neighborhoods without any sufficient justification. Suits targeting such practices reside at the heartland of disparate-impact liability. See, e.g., Huntington,488 U.S., at 16-18, 109 S.Ct. 276(invalidating zoning law preventing construction of multifamily rental units); Black Jack,508 F.2d, at 1182-1188(invalidating ordinance prohibiting construction of new multifamily dwellings); Greater New Orleans Fair Housing Action Center v. St. Bernard Parish,641 F.Supp.2d 563, 569, 577-578 (E.D.La.2009)(invalidating post-Hurricane Katrina ordinance restricting the rental of housing units to only " 'blood relative[s]' " in an area of the city that was 88.3% white and 7.6% black); see also Tr. of Oral Arg. 52-53 (discussing these cases). The availability of disparate-impact liability, furthermore, has allowed private developers to vindicate the FHA's objectives and to protect their property rights by stopping municipalities from enforcing arbitrary and, in practice, discriminatory ordinances barring the construction of certain types of housing units. See, e.g.,Huntington, supra,at 18, 109 S.Ct. 276. Recognition of disparate-impact liability under the FHA also plays a role in uncovering discriminatory intent: It permits plaintiffs to counteract unconscious prejudices and disguised animus that escape easy classification as disparate treatment. In this way disparate-impact liability may prevent segregated housing patterns that might otherwise result from covert and illicit stereotyping.
But disparate-impact liability has always been properly limited in key respects that avoid the serious constitutional questions that might arise under the FHA, for instance, if such liability were imposed based solely on a showing of a statistical disparity. Disparate-impact liability mandates the "removal of artificial, arbitrary, and unnecessary barriers," not the displacement of valid governmental policies. Griggs, supra,at 431, 91 S.Ct. 849. The FHA is not an instrument to force housing authorities to reorder their priorities. Rather, the FHA aims to ensure that those priorities can be achieved without arbitrarily creating discriminatory effects or perpetuating segregation.
Unlike the heartland of disparate-impact suits targeting artificial barriers to housing, the underlying dispute in this case involves a novel theory of liability. See Seicshnaydre, Is Disparate Impact Having Any Impact? An Appellate Analysis of Forty Years of Disparate Impact Claims Under the Fair Housing Act, 63 Am. U. L. Rev. 357, 360-363 (2013)(noting the rarity of this type of claim). This case, on remand, may be seen simply as an attempt to second-guess which of two reasonable approaches a housing authority should follow in the sound exercise of its discretion in allocating tax credits for low-income housing.
An important and appropriate means of ensuring that disparate-impact liability is properly limited is to give housing authorities and private developers leeway to state and explain the valid interest served by their policies. This step of the analysis is analogous to the business necessity standard under Title VII and provides a defense against disparate-impact liability. See 78 Fed.Reg. 11470(explaining that HUD did not use the phrase "business necessity" because that "phrase may not be easily understood to cover the full scope of practices covered by the Fair Housing Act, which applies to individuals, businesses, nonprofit organizations, and public entities"). As the Court explained in Ricci,an entity "could be liable for disparate-impact discrimination only if the [challenged practices] were not job related and consistent with business necessity."
*2523 557 U.S., at 587, 129 S.Ct. 2658. Just as an employer may maintain a workplace requirement that causes a disparate impact if that requirement is a "reasonable measure[ment] of job performance," Griggs, supra,at 436, 91 S.Ct. 849so too must housing authorities and private developers be allowed to maintain a policy if they can prove it is necessary to achieve a valid interest. To be sure, the Title VII framework may not transfer exactly to the fair-housing context, but the comparison suffices for present purposes.
It would be paradoxical to construe the FHA to impose onerous costs on actors who encourage revitalizing dilapidated housing in our Nation's cities merely because some other priority might seem preferable. Entrepreneurs must be given latitude to consider market factors. Zoning officials, moreover, must often make decisions based on a mix of factors, both objective (such as cost and traffic patterns) and, at least to some extent, subjective (such as preserving historic architecture). These factors contribute to a community's quality of life and are legitimate concerns for housing authorities. The FHA does not decree a particular vision of urban development; and it does not put housing authorities and private developers in a double bind of liability, subject to suit whether they choose to rejuvenate a city core or to promote new low-income housing in suburban communities. As HUD itself recognized in its recent rulemaking, disparate-impact liability "does not mandate that affordable housing be located in neighborhoods with any particular characteristic."78 Fed.Reg. 11476.
In a similar vein, a disparate-impact claim that relies on a statistical disparity must fail if the plaintiff cannot point to a defendant's policy or policies causing that disparity. A robust causality requirement ensures that "[r]acial imbalance ... does not, without more, establish a prima facie case of disparate impact" and thus protects defendants from being held liable for racial disparities they did not create. Wards Cove Packing Co. v. Atonio,490 U.S. 642, 653, 109 S.Ct. 2115, 104 L.Ed.2d 733 (1989), superseded by statute on other grounds, 42 U.S.C. § 2000e-2(k). Without adequate safeguards at the prima facie stage, disparate-impact liability might cause race to be used and considered in a pervasive way and "would almost inexorably lead" governmental or private entities to use "numerical quotas," and serious constitutional questions then could arise. 490 U.S., at 653, 109 S.Ct. 2115.
The litigation at issue here provides an example. From the standpoint of determining advantage or disadvantage to racial minorities, it seems difficult to say as a general matter that a decision to build low-income housing in a blighted inner-city neighborhood instead of a suburb is discriminatory, or vice versa. If those sorts of judgments are subject to challenge without adequate safeguards, then there is a danger that potential defendants may adopt racial quotas-a circumstance that itself raises serious constitutional concerns.
Courts must therefore examine with care whether a plaintiff has made out a prima facie case of disparate impact and prompt resolution of these cases is important. A plaintiff who fails to allege facts at the pleading stage or produce statistical evidence demonstrating a causal connection cannot make out a prima facie case of disparate impact. For instance, a plaintiff challenging the decision of a private developer to construct a new building in one location rather than another will not easily be able to show this is a policy causing a disparate impact because such a one-time decision may not be a policy at all. It may also be difficult to establish causation because *2524 of the multiple factors that go into investment decisions about where to construct or renovate housing units. And as Judge Jones observed below, if the ICP cannot show a causal connection between the Department's policy and a disparate impact-for instance, because federal law substantially limits the Department's discretion-that should result in dismissal of this case. 747 F.3d, at 283-284(specially concurring opinion).
The FHA imposes a command with respect to disparate-impact liability. Here, that command goes to a state entity. In other cases, the command will go to a private person or entity. Governmental or private policies are not contrary to the disparate-impact requirement unless they are "artificial, arbitrary, and unnecessary barriers." Griggs,401 U.S., at 431, 91 S.Ct. 849. Difficult questions might arise if disparate-impact liability under the FHA caused race to be used and considered in a pervasive and explicit manner to justify governmental or private actions that, in fact, tend to perpetuate race-based considerations rather than move beyond them. Courts should avoid interpreting disparate-impact liability to be so expansive as to inject racial considerations into every housing decision.
The limitations on disparate-impact liability discussed here are also necessary to protect potential defendants against abusive disparate-impact claims. If the specter of disparate-impact litigation causes private developers to no longer construct or renovate housing units for low-income individuals, then the FHA would have undermined its own purpose as well as the free-market system. And as to governmental entities, they must not be prevented from achieving legitimate objectives, such as ensuring compliance with health and safety codes. The Department's amici,in addition to the well-stated principal dissenting opinion in this case, see post,at 2532 - 2533, 2548 - 2549 (opinion of ALITO, J.), call attention to the decision by the Court of Appeals for the Eighth Circuit in Gallagher v. Magner,619 F.3d 823 (2010). Although the Court is reluctant to approve or disapprove a case that is not pending, it should be noted that Magnerwas decided without the cautionary standards announced in this opinion and, in all events, the case was settled by the parties before an ultimate determination of disparate-impact liability.
Were standards for proceeding with disparate-impact suits not to incorporate at least the safeguards discussed here, then disparate-impact liability might displace valid governmental and private priorities, rather than solely "remov[ing] ... artificial, arbitrary, and unnecessary barriers." Griggs,401 U.S., at 431, 91 S.Ct. 849. And that, in turn, would set our Nation back in its quest to reduce the salience of race in our social and economic system.
It must be noted further that, even when courts do find liability under a disparate-impact theory, their remedial orders must be consistent with the Constitution. Remedial orders in disparate-impact cases should concentrate on the elimination of the offending practice that "arbitrar [ily] ... operate[s] invidiously to discriminate on the basis of rac[e]." Ibid.If additional measures are adopted, courts should strive to design them to eliminate racial disparities through race-neutral means. See Richmond v. J.A. Croson Co.,488 U.S. 469, 510, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989)(plurality opinion) ("[T]he city has at its disposal a whole array of race-neutral devices to increase the accessibility of city contracting opportunities to small entrepreneurs of all races"). Remedial orders that impose racial targets or quotas might raise more difficult constitutional questions.
*2525 While the automatic or pervasive injection of race into public and private transactions covered by the FHA has special dangers, it is also true that race may be considered in certain circumstances and in a proper fashion. Cf. Parents Involved in Community Schools v. Seattle School Dist. No. 1,551 U.S. 701, 789, 127 S.Ct. 2738, 168 L.Ed.2d 508 (2007)(KENNEDY, J., concurring in part and concurring in judgment) ("School boards may pursue the goal of bringing together students of diverse backgrounds and races through other means, including strategic site selection of new schools; [and] drawing attendance zones with general recognition of the demographics of neighborhoods"). Just as this Court has not "question[ed] an employer's affirmative efforts to ensure that all groups have a fair opportunity to apply for promotions and to participate in the [promotion] process," Ricci,557 U.S., at 585, 129 S.Ct. 2658it likewise does not impugn housing authorities' race-neutral efforts to encourage revitalization of communities that have long suffered the harsh consequences of segregated housing patterns. When setting their larger goals, local housing authorities may choose to foster diversity and combat racial isolation with race-neutral tools, and mere awareness of race in attempting to solve the problems facing inner cities does not doom that endeavor at the outset.
The Court holds that disparate-impact claims are cognizable under the Fair Housing Act upon considering its results-oriented language, the Court's interpretation of similar language in Title VII and the ADEA, Congress' ratification of disparate-impact claims in 1988 against the backdrop of the unanimous view of nine Courts of Appeals, and the statutory purpose.
III
In light of the longstanding judicial interpretation of the FHA to encompass disparate-impact claims and congressional reaffirmation of that result, residents and policymakers have come to rely on the availability of disparate-impact claims. See Brief for Massachusetts et al. as Amici Curiae2 ("Without disparate impact claims, States and others will be left with fewer crucial tools to combat the kinds of systemic discrimination that the FHA was intended to address"). Indeed, many of our Nation's largest cities-entities that are potential defendants in disparate-impact suits-have submitted an amicusbrief in this case supporting disparate-impact liability under the FHA. See Brief for City of San Francisco et al. as Amici Curiae3-6. The existence of disparate-impact liability in the substantial majority of the Courts of Appeals for the last several decades "has not given rise to ... dire consequences." Hosanna-Tabor Evangelical Lutheran Church and School v. EEOC,565 U.S. ----, ----, 132 S.Ct. 694, 710, 181 L.Ed.2d 650 (2012).
Much progress remains to be made in our Nation's continuing struggle against racial isolation. In striving to achieve our "historic commitment to creating an integrated society," Parents Involved, supra,at 797, 127 S.Ct. 2738(KENNEDY, J., concurring in part and concurring in judgment), we must remain wary of policies that reduce homeowners to nothing more than their race. But since the passage of the Fair Housing Act in 1968 and against the backdrop of disparate-impact liability in nearly every jurisdiction, many cities have become more diverse. The FHA must play an important part in avoiding the Kerner Commission's grim prophecy that "[o]ur Nation is moving toward two societies, one black, one white-separate and unequal." Kerner Commission Report 1. The Court acknowledges the Fair *2526 Housing Act's continuing role in moving the Nation toward a more integrated society.
The judgment of the Court of Appeals for the Fifth Circuit is affirmed, and the case is remanded for further proceedings consistent with this opinion.
It is so ordered.