[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 17-14254
_____

D.C. Docket No. 6:16-cv-01005-RBD-GJK

OVIEDO TOWN CENTER II, L.L.L.P.,
a Florida Limited Liability Partnership,
OVIEDO LHC I, L.L.C.,
a Florida Limited Liability Company,
OVIEDO LHC II, L.L.C.,
a Florida Limited Liability Company,
OVIEDO LHC III, L.L.C.,
a Florida Limited Liability Company,
OVIEDO LHC IV, L.L.C.,
a Florida Limited Liability Company,
OVIEDO TOWN CENTRE DEVELOPMENT GROUP, L.L.L.P.,
a Florida Limited Liability Partnership,
OVIEDO TOWN CENTRE II PARTNERS, L.L.L.P.,
a Florida Limited Liability Partnership,
OVIEDO TOWN CENTRE III, L.L.L.P.,
a Florida Limited Liability Partnership,
OVIEDO TOWN CENTRE IV, L.L.L.P.,
a Florida Limited Liability Partnership,
ATLANTIC HOUSING PARTNERS L.L.L.P.,
a Florida Limited Liability Partnership,
CONCORD MANAGEMENT, LTD.,
a Florida Limited Partnership,
SOUTH FORK FINANCIAL, L.L.C.,
CPG CONSTRUCTION, L.L.L.P.,
a Florida Limited Liability Partnership,

Plaintiffs - Appellants,

versus

CITY OF OVIEDO, FLORIDA,

Defendant - Appellee.

————————————————

Appeal from the United States District Court
for the Middle District of Florida
————————————————

(December 28, 2018)

Before TJOFLAT, MARCUS, and NEWSOM, Circuit Judges.

PER CURIAM:

In this case, several real estate developers allege that skyrocketing water and sewage bills have violated their rights to due process under the Fourteenth Amendment and have brought the low-income housing complex they operate in Oviedo, Florida to the brink of insolvency in violation of federal and state fair housing laws. The developers claim that the City of Oviedo ("the City") unlawfully changed its utility rate policies in late 2012 and early 2013. The developers brought their claims under the Fair Housing Act and the equivalent Florida statute, urging that the rate increases cause a disparate impact on minorities. They also leveled a due process claim under § 1983. The City argued, however, that the rate increase essentially brought utility bills for appellants'

2

complex, the Oviedo Town Center ("OTC"), in line with those being sent to the rest of Oviedo.

The district court ruled for the City on all claims, granting summary judgment to the City on the housing law claims and dismissing the § 1983 claim. We agree.  On this record, the appellants have failed to establish a prima facie case of disparate impact under the Fair Housing Act or the Florida Fair Housing Act. And they have failed to state a claim under § 1983 because the complaint itself provides rational bases for the rate increases.

## I.

The Oviedo Town Center is an affordable-housing apartment complex located within the City of Oviedo.  The appellants are 13 companies involved in developing and managing the OTC.  They received funding for the OTC through "federal tax-exempt bond and tax credit resources" provided through the Orange County Housing Finance Authority and the Florida Housing Finance Corporation. These funding sources came with conditions: 70% of the units would have to be set aside for tenants at or below 60% of the Area Median Income.  The developers agreed to these resident eligibility restrictions and, correspondingly, to limits on how much their tenants could be charged.

Construction of the OTC was completed in 2008.  It comprises twelve buildings -- eight are residential and these are divided into 236 separate units.

Each of the twelve buildings was connected to the City's water distribution system, and meters were installed to measure water usage. Each building had a master meter that could measure how much water was used throughout a building, and residential units had sub-meters that could measure each unit's individual water usage as well. The sub-metering of individual units was another requirement placed on the OTC by its bond financing.

The terms of the OTC's financing also constrained how rent and utility billing would be structured. The developers had two options: if they paid the OTC's water and sewage bills, rather than passing them on to the tenants, they would be free to charge tenants the total amount of gross rent permissible under their funding agreements. Alternatively, the developers could pass along the water and sewage bills to their tenants, but if they did this, they would be required to reduce the tenants' monthly rental fees in the amount of a "utility allowance," which would be "calculated and approved on an annual basis" by the State. Essentially, the developers could charge more in rent if they paid the utility bills themselves.

There are two components to a monthly water bill assessed by the City. Bills are comprised of a flat base fee charge plus a variable usage charge based on actual water usage. OVIEDO, FLA., ORDINANCES ch. 54, art. II, § 54-23. The Oviedo City Council sets base fees by resolution. Id. From 2008 through 2012,

4

the City charged the OTC base fees pegged to the number of master meters in the complex (twelve), rather than based on the number of sub-meters (236). This meant that each month, the OTC collectively was billed in an amount corresponding to its actual water usage plus twelve base fees, notwithstanding the fact that it included 236 units. The City says that billing in this way was a mistake, and that its longstanding practice had always been to bill multi-family master-metered complexes on a per-unit basis. The developers' claims arose out of a City policy revision that resulted in their being charged per-unit.

In June 2011, the City contracted with a third-party consultant, Public Resources Management Group, and commissioned a "revenue sufficiency and rate study" that would evaluate the City's utility services (the "2012 Study"). One reason why the study was commissioned was that in 2009 the City had acquired a new wastewater and reclaimed utility system and wanted to ensure it had "adequate operational, capital funding and reserve funding of that system." Other goals identified in the study included that "rates should be based on full cost recovery principles," that "rates should be fair and reasonable," and that "rates should promote financial sustainability and creditworthiness."

In December 2012, the City passed Resolution 2576-12 (the "2012 Resolution"), which set new utility rates based on the results of the 2012 Study. The 2012 Resolution distinguished residential and commercial customers, as

5

previous rate-setting resolutions had, but, notably, also added a new subcategory of "master-metered multi-family" under the residential category, thus differentiating single-family residential properties from master-metered multi-family residential properties like the OTC.  Under the new policy (the "2012 Policy"), master-metered multi-family residences would be assessed base charges on a per-unit basis under the 2012 Resolution.  Shortly after passing the Resolution, the City conducted an internal audit of its customer base and realized that it had been "incorrectly" billing OTC by master meter instead of on a per-unit basis.  According to the City it had, since 1992, billed multi-metered facilities on a per-unit basis, but it could not point to a written policy establishing this.

In 2013, the City began charging the Oviedo Town Center utility base rates on a per-unit basis.  This meant that instead of twelve base unit charges, the OTC was charged 236 base unit charges -- one for each individual unit.  The developers asked the City to grant them an exception from the per-unit charge policy, but the City said no.

This lawsuit followed.  The appellants sued the City in the U.S. District Court for the Middle District of Florida on June 9, 2016, seeking damages and injunctive relief in four counts under the Fair Housing Act ("FHA"), 42 U.S.C. §§

3604 and 3613, and the Florida Fair Housing Act[1] ("FFHA"), Fla. Stat. §§ 760.23 and 760.35 (collectively "the FHA claims"). The City moved to dismiss, the appellants amended their complaint, and the City moved to dismiss again. The motion was denied.

On April 18, 2017, the OTC filed a Second Amended Complaint (for our purposes the operative complaint). The four FHA claims remained. The appellants claimed that the City had increased the OTC's base charge by over 2,000%, an increase that, they said, would make it impossible for the OTC to continue operating as an affordable housing community if the City did not grant an exception. The appellants did not challenge the 2012 Policy or the 2012 Resolution as a whole, but simply the City's refusal to grant a requested exception for the OTC. According to the appellants, the Policy would have "a clear and negative disparate impact on protected classes, denying them their rights to housing" because most "Heads of Households in the [OTC] are racial minorities." Moreover, the developers claimed that they too would be injured because the terms of their funding prevented them from raising rents enough to keep pace with their increased utility bills. The appellants said that it would be financially impossible for the OTC to operate and, therefore, they would "be unable to continue to receive

---

[1] "The Florida Fair Housing Act contains statutory provisions that are substantively identical to the federal Fair Housing Act." Loren v. Sasser, 309 F.3d 1296, 1299 n.9 (11th Cir. 2002).

the benefits of the various agreements they have entered into relating to the operation of the [OTC]."

The Second Amended Complaint added a claim under § 1983, alleging that "[t]he [2012] Policy and the City's process of implementing the [2012] Policy, deprived Plaintiffs of their due process interests under the Fourteenth Amendment." The appellants charged that "[t]he [2012] Policy is largely inconsistent with the Report on which [it] was to be based," that the charges imposed by the 2012 Policy "are neither pro-rata nor relevant to the City's costs upon which the charges are intended to cover," and, most fundamentally, that "[t]here is no rational nexus for the charges imposed on Plaintiffs by way of the Policy." In supplemental briefing the developers urged that the City had violated "a state-created right to be free from fees imposed by a municipality (i) that exceed the pro rata share of the reasonably anticipated costs with respect to the purpose of the fee, or (ii) that are otherwise unreasonably excessive as to deny the property owner all reasonable use of the property."

The appellants moved for summary judgment on the fair housing claims only; the City in turn moved the district court for dismissal of the new § 1983 claim along with an application for summary judgment on all claims. The district court ruled across the board for the City -- dismissing the § 1983 claim and

8

granting final summary judgment to the City on the FHA claims.  This timely appeal followed.

## II.

"We review the grant or denial of a motion for summary judgment de novo. In so doing we draw all inferences and review all evidence in the light most favorable to the non-moving party."  Mais v. Gulf Coast Collection Bureau, Inc., 768 F.3d 1110, 1119 (11th Cir. 2014) (citation omitted).  We will affirm if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Both parties had moved for summary judgment here, but the presence of cross motions does not affect our standard of review.  See, e.g., Ft. Lauderdale Food Not Bombs v. City of Ft. Lauderdale, 901 F.3d 1235, 1239 (11th Cir. 2018).

We also review de novo a district court's dismissal of a claim, accepting the factual allegations in the complaint as true and construing them in a light most favorable to the plaintiff.  Boyd v. Warden, 856 F.3d 853, 863–64 (11th Cir. 2017). In order to survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face. . . .  Determining [this] is a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  Id. at 864 (citations,

alterations, and quotations omitted).  "We also review questions of constitutional law de novo."  Kentner v. City of Sanibel, 750 F.3d 1274, 1278 (11th Cir. 2014).

III.

The district court offered three independent reasons why the City was entitled to summary judgment on the FHA claims.  First, the developers had not demonstrated that their injuries were proximately caused by the 2012 Policy.  Second, and even more basic, even if they had established proximate cause the developers had not made out a prima facie case of disparate impact on racial minorities.  Finally, even if proximate cause and a prima facie case had been established, the appellants failed to rebut the City's "legitimate, nondiscriminatory interest in implementing the 2012 Policy."  Because we agree that the appellants failed to establish a prima facie case of disparate impact, we affirm on those grounds; we therefore have no occasion to address the other reasons offered by the district court.

In the course of filing an FHA action, "[a] plaintiff can demonstrate a discriminatory effect in two ways: it can demonstrate that [a defendant's] decision has a segregative effect or that it makes housing options significantly more restrictive for members of a protected group than for persons outside that group."  Hallmark Developers, Inc. v. Fulton Cty., Ga., 466 F.3d 1276, 1286 (11th Cir. 2006) (quotations omitted).  Here, the appellants only relied on the second theory.

10

They argued that "[t]he [OTC] cannot remain economically viable if the City continues to impose the additional base charges" and that "[t]he majority of the Heads of Households in the [OTC] are racial minorities." Consequently, "if the City does not make an exception to the Policy there will be a clear and negative disparate impact on protected classes, denying them their rights to housing." In order to establish disparate impact, the appellants presented a survey and census data showing that the percentage of racial minority heads of households in the OTC is greater than the percentage of racial minority households throughout the City of Oviedo. That was the extent of their proffer.

In 2015, when the Supreme Court confirmed for the first time that disparate impact claims are cognizable under the FHA, it promulgated detailed causation requirements as a means of cabining disparate-impact liability. Thus, in Texas Department of Housing and Community Affairs v. Inclusive Communities Project, Inc., 135 S. Ct. 2507 (2015), the Court considered a Texas nonprofit corporation's allegation that a state agency responsible for distributing federal low-income housing tax credits had done so in a manner that "caused continued segregated housing patterns by its disproportionate allocation of the tax credits." Id. at 2514 (alleging that there were "too many credits for housing in predominantly black inner-city areas and too few in predominantly white suburban neighborhoods"). Disparate-impact liability, the Court explained "is consistent with the FHA's

11

central purpose" of eliminating discrimination, since it can help ameliorate practices that unfairly exclude minorities from certain neighborhoods, can protect property rights, and can help uncover discriminatory intent. Id. at 2521; see id. at 2521–22.

This theory of liability, however, would create substantial difficulties if applied too expansively. Specifically, the Court wrote, "serious constitutional questions . . . might arise . . . if such liability were imposed based solely on a showing of a statistical disparity." Id. at 2522. If a disparate impact claim could be founded on nothing more than a showing that a policy impacted more members of a protected class than non-members of protected classes, disparate-impact liability undeniably would overburden cities and developers. See id. at 2522–23. The Court explained that it was important to allow "housing authorities and private developers . . . to maintain a policy [that might implicate the FHA] if they can prove it is necessary to achieve a valid interest." Id. at 2523; see id. at 2522–23 (drawing a comparison to Title VII's business necessity standard). Because "[t]he FHA is not an instrument to force housing authorities to reorder their priorities," id. at 2522, and because it "does not decree a particular vision of urban development," id. at 2523, "[c]ourts should avoid interpreting disparate-impact liability to be so expansive as to inject racial considerations into every housing decision," id. at 2524.

12

The Supreme Court's solution was to impose "[a] robust causality requirement ensur[ing] that '[r]acial imbalance . . . does not, without more, establish a prima facie case of disparate impact.'" Id. at 2523 (quoting Wards Cove Packing Co. v. Atonio, 490 U.S. 642, 653 (1989) (alteration in original), superseded by statute on other grounds, 42 U.S.C. § 2000e-2(k)).  Without this kind of requirement, a disparate impact claim could be leveled whenever a city or a developer decided "to build low-income housing in a blighted inner-city neighborhood instead of a suburb, . . . or vice versa," because disproportionate numbers of members of racial minorities or majorities inevitably would be impacted.  Id.  Unbounded disparate-impact claims would push governments and private entities towards erecting "numerical quotas," a deeply troubling event.  Id. Although it left space for the lower courts to elaborate on what could meet this causality requirement, the Court was crystal clear that some allegations would fall far short: "[a] plaintiff who fails to allege facts at the pleading stage or produce statistical evidence demonstrating a causal connection cannot make out a prima facie case of disparate impact." Id. at 2523.

Even before the Supreme Court spoke to this question, this Court had arrived at similar conclusions, entirely consistent with Inclusive Communities, about the need for a relevant statistical showing in order to support a disparate-impact claim under the FHA, in Schwarz v. City of Treasure Island, 544 F.3d 1201 (11th Cir.

13

2008). There, the plaintiff, who operated halfway houses for recovering substance abusers in the City of Treasure Island, Florida, had been cited by the City for violating a zoning ordinance that limited occupancy turnover. Id. at 1205. He sued the city under the FHA, alleging, among other things, that the zoning ordinance had a disparate impact on the rights of the disabled (the recovering substance abusers). Id. The claim failed because the plaintiff provided no comparative data to support his prima facie case. Id. at 1217–18. We held that in order to show disparate impact, the plaintiff must provide evidence comparing members of the protected class affected by the ordinance with non-members affected by the ordinance. See id. at 1217. If the percentage of members of the protected class (recovering substance abusers) affected was higher than the percentage of nonmembers impacted, this disproportionality could form the basis for a prima facie case of disparate impact. The plaintiff in Schwarz had failed to provide an adequate statistical foundation because he presented "*no* comparative data at all," but instead simply offered what we termed a "bald assumption" that the ordinance's effect on his houses meant that the handicapped had necessarily been disparately impacted. Id. at 1218.

The evidence presented by the appellants in this case fails to establish a prima facie case for similar reasons. The only statistical evidence presented in this

case was a survey conducted by the plaintiffs, which their representative explained

this way:

> In connection with this litigation Plaintiffs conducted a survey of its residents at the [OTC] to determine the racial composition of the project (the 'Survey'), in which the residents self-reported their race . . . .  The Survey evidenced that approximately 75% of the residents are racial minorities.

The Survey showed that 75.73% of heads of OTC households are members of

racial minorities and that 24.27% of heads of OTC households are white.  By way

of comparison, the Survey cited census data indicating that only 32.7% of

households in Oviedo are racial minority households while 65.8% of households

are not.[2]

As the district court recognized, this data revealed only that more racial

minorities live in Oviedo Town Center than lived in the rest of the City of Oviedo.

It does not establish a disparate impact, let alone any causal connection between

the 2012 Policy and the disparate impact.  If this were enough to make a prima

facie showing, we would face precisely the circumstance the Court sought to avoid

in Inclusive Communities, inappropriately injecting race into a city's

decisionmaking process and creating "disparate-impact liability" that "might

---

[2] The admissibility of the survey was a matter of dispute in the district court, since the developers argued that it was inadmissible hearsay.  The district court was willing to consider it for purposes of summary judgment because it reflected easily ascertainable information and because it did not present the reliability risk that the hearsay rules are intended to prevent.

displace valid governmental and private priorities." See Inclusive Cmtys., 135 S. Ct. at 2524.

As the district court observed, in order to establish a prima facie case of disparate impact, the appellants would have needed to draw a comparison between (a) the percentage of racial minorities occupying multifamily properties impacted by the 2012 Policy throughout the City of Oviedo and (b) the percentage of non-minorities living in such properties, again throughout the City of Oviedo. If this citywide comparison demonstrated that a disproportionate percentage of racial minorities in multifamily properties were impacted across the city, a prima facie case of disparate impact might have been presented, and we would then proceed to consider the causal relation. This kind of citywide comparative analysis would be necessary because, since the policy impacts the whole city, the whole city would need to be evaluated before we could determine that the claimed impact might have disparately fallen on certain insular groups. See Schwarz, 544 F.3d at 1218. But since all the appellants have shown us is that the OTC's residents are disproportionately racial minorities, we need go no further because this necessarily fails to make out a prima facie case. Just as in Schwarz, the developers here have "completely failed to present relevant comparative evidence" and "the district court was right to reject [the] disparate impact claim." Id.

16

Significantly, in its briefing before this Court, the appellants failed to directly challenge the district court's holding that they had not established a prima facie case of disparate impact, even though that was an independent ground for the entry of summary judgment. In both their opening and reply briefs, the appellants conflated the district court's prima facie case holding with its proximate cause holding, saying nothing about the foundations of their statistical presentation, let alone addressing the district court's reasoning. And when asked about the matter at oral argument, the developers argued for the first time that the survey did provide a relevant citywide comparison because the OTC was the only property affected by the challenged policy. A suggestion to this effect does appear in their briefing, but it was never presented, until oral argument, as a response to the district court's determination that the survey was inadequate to establish a prima facie case. The argument that the survey was sufficient because only the OTC was affected was, then, a new argument introduced for the first time at oral argument, and we will not address it. See Access Now, Inc. v. Southwest Airlines Co., 385 F.3d 1324, 1330 (11th Cir. 2004) ("[T]he law is by now well settled in this Circuit that a legal claim or argument that has not been briefed before the court is deemed abandoned and its merits will not be addressed.").[3]

---

[3] In any event, the argument does not create a triable issue of material fact. To support the claim that the OTC was the only building affected, the appellants cite the deposition of the City's finance director who said in a deposition that he was "aware" of one customer impacted by the

17

IV.

The district court also ruled in the City's favor on the appellants' § 1983 claim. This claim was raised for the first time in the Second Amended Complaint and comes before this Court only on a motion to dismiss. Although the parties have completed discovery and made arguments on other claims based on the evidence that has been presented, we may not consider, during our review of this claim, anything beyond the four corners of the operative complaint and any attachments thereto. Fin. Sec. Assurance, Inc. v. Stephens, Inc., 500 F.3d 1276, 1284 (11th Cir. 2007) (per curiam); see also Boyd v. Warden, 856 F.3d 853, 863–64 (11th Cir. 2017) (setting out the standard of review for a motion to dismiss). We may, as always, though, "draw on [our] judicial experience and common sense." Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009).[4]

---

2012 resolution, the OTC. The fact that he was aware of only the OTC does not establish that no other customers were affected -- we would expect the director to be most familiar with the property whose developers asked for an exception and then brought a lawsuit for which he was being deposed. This tells us nothing about other multi-family properties in the City, and the appellants have identified no additional evidence to support their claim that no such properties exist.

[4] The City had moved both to dismiss the § 1983 claim and for summary judgment on it. Because discovery had taken place and because other claims were being decided on a motion for summary judgment, the district court might have either entertained the motion for summary judgment or explicitly converted the motion to dismiss into a motion for summary judgment. See Michel v. NYP Holdings, Inc., 816 F.3d 686, 701 (11th Cir. 2016). But the district court only reviewed the motion to dismiss the claim, and did not look beyond the pleadings in its analysis. Neither party has suggested that anything other than the typical motion to dismiss standard of review applies in our review of the district court's ruling on the appellants' § 1983 claim.

18

As for their § 1983 claim, the appellants argued that "[t]he Policy, and the City's process of implementing the Policy, deprived the developers of their due process interests under the Fourteenth Amendment." Notably, this claim does not allege any racial discrimination, and the parties agree on how it ought to be considered. They agree with the district court that "state-created rights are generally not subject to substantive due process protection." See McKinney v. Pate, 20 F.3d 1550, 1556 (11th Cir. 1994) (en banc). They further agree that the claim here falls into an exception to this rule, recognized in this Circuit, for "legislative acts." See id. at 1557 n.9. The parties even agree that the ultimate standard applicable to this claim is rational basis review, because we have said that "[w]here an individual's state-created rights are infringed by [a] 'legislative act,' the substantive component of the Due Process Clause generally protects him from arbitrary and irrational action by the government." Lewis v. Brown, 409 F.3d 1271, 1273 (11th Cir. 2005) (per curiam) (citing McKinney, 20 F.3d at 1557 n.9); see also Kentner v. Sanibel, 750 F.3d 1274, 1281 (11th Cir. 2014) (applying a rational basis test when reviewing the dismissal of a substantive due process claim to which the "legislative act" exception applied). The parties disagree only about the application of rational basis scrutiny to this claim.

It is quite easy for a legislative act to survive rational basis scrutiny since the standard is "highly deferential" and "proscribes only the very outer limits of a

legislature's power." Williams v. Pryor, 240 F.3d 944, 948 (11th Cir. 2001).

Thus, a statute being measured against the template of rational basis review

"comes to us bearing a strong presumption of validity." FCC v. Beach Commc'ns,

Inc., 508 U.S. 307, 314 (1993). There has been no suggestion that utility rates are

beyond the City's power to regulate; therefore, we only ask "whether there is a

rational relationship between the government's objective and the means it has

chosen to achieve it." Blue Martini Kendall, LLC v. Miami-Dade Cty., Fla., 816

F.3d 1343, 1351 (11th Cir. 2016) (quotations omitted). And the rational basis we

identify need not even be the actual basis that motivated the legislature. See id.

As a result, "the challenger bears 'the burden to negative every conceivable basis

which might support [the law].'" Id. (quoting Beach Commc'ns, 508 U.S. at 315)

(alteration in original). "Only in an exceptional circumstance" will a challenger

succeed in showing that a legislative act cannot "be rationally related to a

legitimate government interest." Id.

Our review is complicated only by the fact that on a motion to dismiss we

may consider only the facts presented in the complaint and accompanying exhibits.

Nonetheless, our opinion in Kentner v. City of Sanibel, 750 F.3d 1274 (11th Cir.

2014), demonstrates that a legislative act may satisfy rational basis scrutiny even at

the motion to dismiss stage. There, property owners in a waterfront area

challenged a local ordinance that the City of Sanibel said was intended to protect

certain seagrasses, but which the plaintiffs alleged was truly motivated by aesthetic preferences and desire to protect the property values of certain other property owners.  Id. at 1277.  As is the case here, the question was whether plaintiffs had properly plead that the ordinance lacked any rational basis.  Id. at 1280–81.  They had not, we held, because "Plaintiffs themselves plead at least two rational bases for the Ordinance in their Amended Complaint: (1) protection of seagrasses and (2) aesthetic preservation."  Id. at 1281.  By suggesting these rational foundations, the plaintiffs had defeated their own argument that it could not possibly be rational.

Here, the plaintiffs have likewise offered a wholly rational basis for the policy in their own complaint.  Thus the Second Amended Complaint contains the following averments:

28.   On December 3, 2012, the City passed Resolution 2576-12, which amended the City's utility service charges to add a "Master-Metered Multi-Family (per unit)" charge (the "Policy"). . . .

29.   The City asserts the Policy was founded upon and designed to implement a City of Oviedo, Florida 2012 Water and Wastewater Rate and Capital Recovery Charge Study (the "Study") performed by Public Resources Management Group, Inc. and dated December 2012, and is consistent with its historical actions in charging base utility fees.

The district court identified these paragraphs as providing a rational basis -- "generating sufficient funds to operate the City's utility systems."  More specifically, these paragraphs suggest two rational reasons for the policy: (1)

21

capital recovery; and (2) a need to periodically update rate policy in a way consistent with historical practice. The resolution, attached as an exhibit to the complaint, provides context on both points. The City had recently required a new sanitary system and was beginning a five year consolidation process. It would be altogether rational to adjust utility fees in order to fund this process and to recover capital. The resolution also indicates that it was intended to amend a previous resolution. This places the Policy in its proper context and makes it abundantly clear that adjusting rates was an ongoing, year-to-year process, and this resolution was only the latest iteration.

Against this conclusion, the appellants argue that although the complaint suggests that the policy might be justified in this way, "the allegations of the Operative Complaint . . . specifically provide that 'the Policy is largely inconsistent with the study.'" The appellants acknowledge that they identified a rational basis for the policy like the Kentner plaintiffs before them, but, they argue, the Court cannot uphold the policy on that basis because the entirety of the Second Amended Complaint suggests that the basis they identified cannot be the "true" reason for the policy. In Kentner, though, the complaint had alleged that one of the rational bases the court identified -- seagrass preservation -- did not actually motivate the legislature. See Kentner, 750 F.3d at 1277. We still identified the allegedly pretextual reason as a conceivable rational basis, and we do so here as well. We

22

take the allegations in the Second Amended Complaint as true, and for our purposes we assume that the appellants are correct that the 2012 Policy is inconsistent with the study.  Even so, the goals that the study ostensibly set form a rational basis for the policy.  See Blue Martini, 816 F.3d at 1351 ("[T]he legislature need not have actually been motivated by the rational reason presented to the court . . . .").

In short, as we see it, the district court appropriately ruled in the City's favor, granting final summary judgment to the city on the FHA claims and dismissing the § 1983 claim.

**AFFIRMED**