In the

# United States Court of Appeals

## For the Seventh Circuit

_____

No. 17-1206

DALE E. KLEBER,

*Plaintiff-Appellant,*

*v.*

CAREFUSION CORPORATION,

*Defendant-Appellee.*

_____

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 15-cv-01994 — **Sharon Johnson Coleman**, *Judge.*

_____

ARGUED OCTOBER 23, 2017 — DECIDED APRIL 26, 2018

_____

Before BAUER and HAMILTON, *Circuit Judges*, and DARROW,
*District Judge.*[*]

HAMILTON, *Circuit Judge.* The key provision of the Age
Discrimination in Employment Act of 1967 prohibits
employment practices that discriminate intentionally against
older workers, and prohibits employment practices that have

_____

[*] The Honorable Sara Darrow, United States District Judge for the
Central District of Illinois, sitting by designation.

a disparate impact on older workers. 29 U.S.C. § 623(a)(1), (a)(2); *Smith v. City of Jackson*, 544 U.S. 228 (2005). The central issue in this appeal is whether the disparate impact provision, § 623(a)(2), protects only current employees or whether it protects current employees *and* outside job applicants. We hold that § 623(a)(2) protects both outside job applicants and current employees. That is the better reading of the statutory text. It is also more consistent with the purpose of the Act and nearly fifty years of case law interpreting the ADEA and similar language in other employment discrimination statutes.

In fact, our reading tracks the Supreme Court's reading of virtually identical statutory language in Title VII of the Civil Rights Act of 1964 in *Griggs v. Duke Power Co.*, 401 U.S. 424, 426 n.1, 431 (1971), which found that this text protects "the job-seeker." In holding that the ADEA covers disparate impact claims, the Supreme Court identified *Griggs* as "a precedent of compelling importance" in interpreting § 623(a)(2), *Smith*, 544 U.S. at 234, so we apply it here. Moreover, we have not been presented with, and could not imagine on our own, a plausible policy reason why Congress might have chosen to allow disparate impact claims by current employees, including internal job applicants, while excluding outside job applicants.

We therefore reverse the district court's Rule 12(b)(6) dismissal of plaintiff Dale Kleber's disparate impact claim and remand for further proceedings. Given the stage of the case, we do not address possible affirmative defenses under § 623(f)(1), including the defense that the challenged practice was "based on reasonable factors other than age."

Part I provides the factual and procedural background for the issue. Part II examines the text, purpose, and origins of § 623(a)(2), as well as the practical consequences of the interpretations advanced by the parties. Part III addresses the unusually wide array of arguments, rebuttals, and sur-rebuttals marshaled by the parties to support their competing interpretations § 623(a)(2). Part IV explains why the plaintiff did not fail to exhaust his administrative remedies.

I.    *Factual Background and Procedural History*

In reviewing a dismissal for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), we treat as true the factual allegations in the complaint without vouching ourselves for their truth. *Bonnstetter v. City of Chicago*, 811 F.3d 969, 973 (7th Cir. 2016). Plaintiff Dale Kleber is an attorney with extensive legal and business experience, including private law practice in Chicago, work as a general counsel for a major national company, and leadership of a national trade association, a real estate development company, and a medical device company. After his employment ended in July 2011, Kleber began applying for other legal jobs, primarily those in corporate legal departments. Kleber sent out more than 150 applications in total, without success, including applications for less senior positions. In 2014, Kleber was 58 years old and searching actively for a full-time position.

On March 5, 2014, Kleber applied for a position as "Senior Counsel, Procedural Solutions" with defendant CareFusion Corporation, a healthcare products company. The job posting called for "a business person's lawyer" with the ability "to assume complex projects," which we must assume would be well-suited to Kleber's skills and experience. The job posting also said, however, that applicants must have "3 to 7 years (no

more than 7 years) of relevant legal experience." CareFusion received Kleber's application but did not select him for an interview. The company eventually filled the position with a 29-year-old applicant.

The seven-year experience cap is at the heart of this lawsuit. In this appeal from a Rule 12(b)(6) dismissal, we must assume that the company did not select Kleber because he had more than seven years of relevant legal experience. Because of the experience cap, Kleber filed a charge of age discrimination with the Equal Employment Opportunity Commission. CareFusion responded in a letter to the EEOC saying its maximum experience cap in the job posting was an "objective criterion based on the reasonable concern that an individual with many more years of experience would not be satisfied with less complex duties … which could lead to issues with retention."

After the EEOC issued Kleber a right-to-sue letter in December 2014, he filed this suit alleging claims for both disparate treatment and disparate impact under the relevant clauses of section 4 of the ADEA, 29 U.S.C. § 623(a)(1) & (a)(2). Kleber alleged that the maximum experience cap was "based on unfounded stereotypes and assumptions about older workers, deters older workers from applying for positions … and has a disparate impact on qualified applicants over the age of 40."

CareFusion moved to dismiss both claims. The district court dismissed the disparate impact claim under Rule 12(b)(6), relying on our decision in *E.E.O.C. v. Francis W. Parker School*, 41 F.3d 1073 (7th Cir. 1994), to hold that the ADEA's disparate impact provision does not cover job applicants who are not already employed by the defendant.

The court denied dismissal on the disparate treatment claim. Kleber later dismissed the disparate treatment claim voluntarily. The district court entered final judgment for CareFusion. Kleber then appealed, challenging only the district court's dismissal of his § 623(a)(2) disparate impact claim.

II.   *The Scope of Disparate Impact Protection*

   A.   *The Text of the ADEA*

      1.   *Dissecting § 623(a)(2)*

This appeal from a Rule 12(b)(6) dismissal presents a legal issue that we review *de novo*: whether § 623(a)(2) protects outside job applicants from employment practices that have a disparate impact on older applicants. See *Bell v. City of Chicago*, 835 F.3d 736, 738 (7th Cir. 2016). We begin with the statutory language, of course. We analyze the specific words and phrases Congress used, though we cannot lose sight of their "place in the overall statutory scheme," since we "construe statutes, not isolated provisions." *King v. Burwell*, 135 S. Ct. 2480, 2489 (2015), quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000), and *Graham County Soil and Water Conservation Dist. v. United States ex rel. Wilson*, 559 U.S. 280, 290 (2010).

The key provision of the ADEA, 29 U.S.C. § 623(a), reads:

It shall be unlawful for an employer—

(1) to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age;

(2) to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's age; or

(3) to reduce the wage rate of any employee in order to comply with this chapter.

The disparate treatment provision, paragraph (a)(1), does not refer to job applicants, but it clearly applies to them by making it unlawful for the employer "to fail or refuse to hire … any individual … because of such individual's age." The disparate impact provision, paragraph (a)(2), also does not refer specifically to applicants or hiring decisions, but its broad language easily reaches employment practices that hurt older job applicants as well as current employees.

Despite the length of this opinion, resulting from the unusually deep layers of arguments about this language, we can explain our basic textual reading in this and the following three paragraphs. We start with the critical statutory language, "to limit, segregate, or classify" employees. If an employer classifies a position as one that must be filled by someone with certain minimum or maximum experience requirements, it is classifying its employees. If the classification "would deprive or tend to deprive any individual of employment opportunities," paragraph (a)(2) can reach that classification. The broad phrase "any individual" reaches job applicants, so the focus turns to the employer's action and its effects on the individuals impacted by it—i.e., whether the employer has classified jobs in a way that tends to limit any individual's employment opportunities. See *Smith v. City of Jackson*, 544 U.S. 228, 234,

235–38 (2005) (plurality) (explaining that this "text focuses on the *effects* of the action" and not the employer's motive); *id.* at 243 (Scalia, J., concurring).[1]

To oppose this conclusion, the defendant emphasizes the phrase "or otherwise adversely affect his status as an employee." § 623(a)(2). The antecedent of "his" is "any individual," and "otherwise adversely affect" is broader than "deprive or tend to deprive any individual of employment opportunities." If "any individual" is not already employed by the employer in question, reasons the defendant, the individual does not yet have "status as an employee" and so is not protected from policies or practices that have disparate impacts because of age. The defendant thus concludes that a person's status as an employee cannot be affected unless the person is *already* an employee, so paragraph (a)(2) implicitly limits its protections from disparate impacts to people who already possess "status as an employee" with the defendant-employer.

Looking only at the language of paragraph (a)(2) in isolation, the defense argument has some plausibility, but we reject it for several reasons we explain in detail below. At the most basic textual level, there are two fundamental problems. First, the defense argument assumes that "status as an employee" limits the already broad phrase, "deprive or tend to deprive any individual of employment opportunities." It is not self-evident—as a matter of plain meaning—that the last

---

[1] Justice Scalia joined Parts I, II, and IV of the *Smith* opinion by Justice Stevens, saying that he also agreed with the plurality's reasoning in Part III. 544 U.S. at 243. We therefore treat all parts of the *Smith* opinion by Justice Stevens as authoritative without repeatedly citing Justice Scalia's concurrence.

"status" phrase *must* be read as a limitation. A list culminating in an "or otherwise" term could instead direct the reader to consider the last phrase alternatively, "in addition to" what came before. For example, an employer could violate the ADEA by adversely affecting the status of its employees (e.g., by unreasonably giving bigger raises to junior employees, as alleged in *Smith*, 544 U.S. at 231) without depriving an individual of employment opportunities, i.e., better jobs and promotions. In this sense, paragraph (a)(2) "enumerates various factual means of committing a single element"— imposing employment policies that have disparate impacts on older workers. See *Mathis v. United States*, 136 S. Ct. 2243, 2249 (2016) (discussing various ways to write an "alternatively phrased law").

Second, even if "status as an employee" must be affected to state a claim under (a)(2), the defense argument depends entirely on the notion that "status as an employee" is not affected when a person is denied the opportunity to become an employee in the first place. That limiting assumption is clever, but we believe it is incorrect. Deciding whether a person becomes an employee or not has the most dramatic possible effect on "status as an employee." Courts often speak of "denying status" of one sort or another.[2] And the word

---

[2] Judge Martin's dissent in *Villarreal v. R.J. Reynolds Tobacco Co.*, 839 F.3d 958 (11th Cir. 2016) (en banc), collected several examples. 839 F.3d at 983 & n.2, citing *Howard Delivery Serv., Inc. v. Zurich Am. Ins. Co.*, 547 U.S. 651, 656 (2006) (bankruptcy claimant could be "denied priority status"); *Chandris, Inc. v. Latsis*, 515 U.S. 347, 372 (1995) (maritime worker could "be denied seaman status"); *McNary v. Haitian Refugee Ctr., Inc.*, 498 U.S. 479, 496 (1991) (person trying to do seasonal work could be "denied [special agricultural worker] status"); *Clark v. Gabriel*, 393 U.S. 256, 264 (1968) (draft registrant could be "denied [conscientious objector] status").

"status" is not necessarily limited to status as of any particular moment. See Pub. L. No. 82-248, § 1, 65 Stat. 710 (1951), codified at 1 U.S.C. § 1 (Dictionary Act providing that unless the context indicates otherwise, "words used in the present tense include the future as well as the present"). Thus, if Congress really meant to outlaw employment practices that tend to deprive older workers of employment opportunities, which it did, *but at the same time deliberately chose to leave a wide array of discriminatory hiring practices untouched*, its use of the phrase "status as an employee" would have been a remarkably indirect and even backhanded way to express that meaning.

Looking beyond the text of paragraph (a)(2) at the larger context of the ADEA as a whole, as well as the Supreme Court's interpretation of identical language in Title VII of the Civil Rights Act of 1964 in *Griggs v. Duke Power Co.*, 401 U.S. 424, 430–31 (1971) (disparate impact provision applies to both job-seekers and employees seeking promotions)**,** we reject the

---

We have also used this phrasing in a variety of contexts. *Bell v. Kay*, 847 F.3d 866, 868 (7th Cir. 2017) (plaintiff objected to "the order denying him pauper status"); *McMahon v. LVNV Funding, LLC*, 807 F.3d 872, 875 (7th Cir. 2015) (observing that "the denial of class status is likely to be fatal to this litigation"); *Moranski v. General Motors Corp.*, 433 F.3d 537, 538 (7th Cir. 2005) (analyzing "denial of Affinity Group status" affecting a proposed group of employees); *Hileman v. Maze*, 367 F.3d 694, 697 (7th Cir. 2004) (plaintiff alleged injury resulting "from the denial of her status" as candidate in local election); *Resser v. Comm'r of Internal Revenue*, 74 F.3d 1528, 1532 (7th Cir. 1996) (appealing "denial of 'innocent spouse' status" in Tax Court); *Williams v. Katz*, 23 F.3d 190, 191 (7th Cir. 1994) (spurned intervenor permanently "denied the status of a party" in litigation); *Lister v. Hoover*, 655 F.2d 123, 124–25 (7th Cir. 1981) (plaintiffs "who were denied resident status and the accompanying reduced tuition" at a state university).

defendant's unduly narrow reading of paragraph (a)(2). See *Smith*, 544 U.S. at 233–38 (applying *Griggs* to § 623(a)(2) in ADEA); *Texas Dep't of Housing and Community Affairs v. Inclusive Communities Project, Inc.*, 135 S. Ct. 2507, 2518 (2015) ("antidiscrimination laws must be construed to encompass disparate-impact claims when their text refers to the consequences of actions and not just to the mindset of actors, and where that interpretation is consistent with statutory purpose").

The parties here and other courts addressing this problem under § 623(a)(2) have laid out an unusually large variety of textual arguments. Most are spelled out well on both sides of the debate in the several opinions in the Eleventh Circuit's *en banc* decision, *Villarreal v. R.J. Reynolds Tobacco Co.*, 839 F.3d 958 (11th Cir. 2016), where the majority concluded that outside job applicants could not bring disparate impact claims under the ADEA. See also *Rabin v. PricewaterhouseCoopers LLP*, 236 F. Supp. 3d 1126 (N.D. Calif. 2017) (agreeing with *Villarreal* dissent and denying judgment on pleadings on disparate impact claim by putative class of outside job applicants).

2. *Considering Consequences of the Interpretations*

In the following pages, we dive more deeply into the layers of the textual arguments offered in this appeal. Before we do, it is useful to pause to consider the practical consequences of the parties' readings of paragraph (a)(2). See, e.g., *Graham County*, 559 U.S. at 299–301 (considering practical consequences of parties' interpretations when determining better reading of statute); *Dewsnup v. Timm*, 502 U.S. 410, 416–20 (1992) (same).

Suppose the defendant is correct that paragraph (a)(2) applies only to current employees. Imagine two applicants for the defendant's senior counsel position: both are in their fifties, and both have significantly more than seven years of relevant legal experience. One is Kleber, who does not currently have a job with the defendant. The other already has a job with the defendant but wants a transfer or promotion to the senior counsel position. Both are turned down because they have more than the maximum seven years of experience. According to the defendant's interpretation of paragraph (a)(2), the internal applicant can sue for a disparate impact violation, but the external one cannot.

That result would be arbitrary and even baffling, especially under a statute with the stated purpose "to prohibit arbitrary age discrimination in employment." 29 U.S.C. § 621(b). And this view depends entirely on the assumption that the statutory phrase "otherwise adversely affect his status as an employee" cannot possibly be applied to someone who is, because of the challenged employment practice, completely denied *any* status as an employee. We doubt that when the ADEA was enacted, "a reasonable person conversant with applicable social conventions would have understood" the ADEA as drawing the line the defendant proposes here. See John F. Manning, *What Divides Textualists from Purposivists?*, 106 Colum. L. Rev. 70, 77 (2006); accord *In re Sinclair*, 870 F.2d 1340, 1342 (7th Cir. 1989).

The problems with the defendant's interpretation do not end there. If the statute actually drew this arbitrary line between inside and outside applicants, still further arbitrary line-drawing would be needed. Suppose the applicant is currently employed by a sister subsidiary of the employer.

Does she have "status as an employee" so that she could assert a disparate impact claim? Or suppose the applicant was recently laid off by the employer and challenges its failure to recall her. Or suppose the applicant currently has a temporary position as an independent contractor through a temporary employment agency. We see no arguable policy reason to exclude any of these applicants from the disparate impact protection of paragraph (a)(2).

The defendant and other proponents of the no-outside-applicants interpretation of paragraph (a)(2) have not offered a reason why Congress might have chosen to allow the inside applicant but not the outside applicant to assert a disparate impact claim.[3] We have tried, too, but cannot imagine a

---

[3] The *amicus* supporting the defendant does not address this inside-v.-outside-applicant problem. Instead it offers policy arguments on two different points—why Congress may have intended the ADEA's coverage to be narrower than that of Title VII, and what might happen in the business world if this court agrees with plaintiff Kleber. See App. Dkt. 19. Both points have already been addressed by the Supreme Court in *Smith*. Because the kinds of discrimination they seek to prohibit are different, the ADEA has both broader affirmative defenses and more specific disparate impact claim requirements for the plaintiff than Title VII. Together these elements mean that disparate impact claims under the ADEA must both identify a specific "test, requirement, or practice … that has an adverse impact on older workers" and, where applicable, overcome the rebuttal that the practice is "based on reasonable factors other than age." *Smith*, 544 U.S. at 241. Hiring programs that usually cater to young people (*e.g.*, those for recent college graduates) would be problematic under *Smith* only if they used specific and unreasonable practices that in the aggregate tended to have adverse impacts on applicants over 40. See also *Hodgson v. Approved Personnel Service, Inc.*, 529 F.2d 760, 766 (5th Cir. 1975) (observing that ADEA is not violated by an "advertisement directed to 'recent graduates' as part of a broad, general invitation" to apply, provided there

plausible policy reason for drawing that arbitrary line. We recognize, of course, that Congress can and often does draw arbitrary lines when it wants to do so. When it does, we enforce those lines, absent constitutional problems. See, e.g., *Stephens v. Heckler*, 766 F.2d 284, 286 (7th Cir. 1985) (Congress can dictate outcomes even though "there is no shortage of arbitrariness in disability cases"); *First Chicago NBD Corp. v. Comm'r of Internal Revenue*, 135 F.3d 457, 460 (7th Cir. 1998) ("arbitrariness is everywhere in the tax code, so that an approach to interpretation that sought to purge the arbitrary from the code would be quixotic").

But when courts interpret statutory language that is less than crystalline, it is worth keeping in mind the practical consequences of the argued interpretations. See, e.g., *Graham County*, 559 U.S. at 283, 299–301 (False Claims Act); *Gustafson v. Alloyd Co., Inc.*, 513 U.S. 561, 564, 578 (1995) (Securities Act of 1933); see also, e.g., *Kennedy v. Chemical Waste Mgmt., Inc.*, 79 F.3d 49, 51 (7th Cir. 1996) (Americans with Disabilities Act); *Martin v. Luther*, 689 F.2d 109, 114 (7th Cir. 1982) (reaching conclusion about parole revocation "supported by common sense and an assessment of the practical consequences, which naturally guide our interpretation of legislative enactments").

B. *Assumptions of the ADEA's Drafters*

Another important guide for understanding why the better reading of 29 U.S.C. § 623(a)(2) allows disparate impact claims by outside job applicants comes from consulting the purpose of the statute in more detail. As we explained in *In re Sinclair* with respect to the bankruptcy code, this requires

is no "implication that persons older than the normal 'recent graduate'" are disfavored).

looking at the circumstances surrounding the enactment at issue:

> An unadorned "plain meaning" approach to interpretation supposes that words have meanings divorced from their contexts—linguistic, structural, functional, social, historical. Language is a process of communication that works only when authors and readers share a set of rules and meanings. *In re Erickson*, 815 F.2d 1090 (7th Cir. 1987). What "clearly" means one thing to a reader unacquainted with the circumstances of the utterance—including social conventions prevailing at the time of drafting—may mean something else to a reader with a different background. Legislation speaks across the decades, during which legal institutions and linguistic conventions change. To decode words one must frequently reconstruct the legal and political culture of the drafters. Legislative history may be invaluable in revealing the setting of the enactment and the assumptions its authors entertained about how their words would be understood. It may show, too, that words with a denotation "clear" to an outsider are terms of art, with an equally "clear" but different meaning to an insider. It may show too that the words leave gaps, for short phrases cannot address all human experience; understood in context, the words may leave to the executive and judicial branches the task of adding flesh to bones.

870 F.2d at 1342.

There can be no doubt that Congress enacted the ADEA to address unfair employment practices that make it harder for

older people to *find* jobs. The ADEA is now more than 50 years old. It has been amended numerous times, but the disparate impact language we address here has not changed since the initial enactment in 1967. See Pub. L. 90-202, § 4(a)(2), 81 Stat. 603 (1967).

We know from the text of the ADEA itself that Congress set out to address "the incidence of unemployment, especially long-term unemployment" among older workers. 29 U.S.C. § 621(a)(3). Congress was "especially" concerned about the difficulty older workers faced in trying to "regain employment when displaced from jobs"—in other words, when older workers were *applying for jobs*. See § 621(a)(1). Unemployment ends when a person who is not currently employed applies successfully for a job. As the ADEA provides, "it is … the purpose of this chapter to promote employment of older persons based on their ability rather than age." § 621(b). These findings do not specifically use the term "job applicants," but we know from the reference to "regain employment" and from the 1965 Department of Labor report that was the catalyst for the ADEA—known as the Wirtz Report—that Congress had job applicants very much in mind.

In 1964, Congress ordered the Department of Labor to recommend "legislation to prevent arbitrary discrimination in employment because of age." The result was the Wirtz Report. U.S. Department of Labor, The Older American Worker: Age Discrimination in Employment 1 (1965), reprinted in *Employment Problems of Older Workers: Hearings on H.R. 10634 and Similar Bills Before the Select Subcomm. on Labor of the H. Comm. on Educ. and Labor*, 89th Cong. 201–387 (1966). The Supreme Court has repeatedly treated the Wirtz Report

as an authoritative guide in interpreting the ADEA. See *Smith v. City of Jackson*, 544 U.S. 228, 238 (2005) ("we think the history of the enactment of the ADEA, with particular reference to the Wirtz Report, supports the pre-*Hazen Paper* consensus concerning disparate-impact liability"); *General Dynamics Land Systems, Inc. v. Cline*, 540 U.S. 581, 587, 590 (2004); *EEOC v. Wyoming*, 460 U.S. 226, 230–32 (1983), abrogated in part on other grounds, *Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528 (1985).

The Wirtz Report sought to explain the role of age and age discrimination "as a factor in the unemployment of older workers." Wirtz Report at 3. This discrimination, the report found, was not necessarily the result of "any employer malice, or unthinking majority, but from the ruthless play of wholly impersonal forces," i.e., the interaction between technological progress and stereotypes and assumptions about older workers. *Id.*

Those stereotypes and assumptions, the department found, led to "hiring practices that take the form of specific age limits applied to older workers as a group." *Id.* at 5. Age limits for job applicants were so prevalent in the 1960s that "[a]lmost three out of every five employers" surveyed had an age limit for "new hires which they apply without consideration of an applicant's other qualifications." *Id.* at 6. The Wirtz Report found that a "significant proportion of the age limitations presently in effect ... have been established without any determination of their actual relevance to job requirements, and are defended on grounds apparently different from their actual explanation." *Id.* at 7. These limits caused a significant number of older workers to find themselves among the long-term unemployed, unable but

still wanting to provide for a life and standard of living above the subsistence floor of public assistance programs:

> There is, in this connection, no harsher verdict in most men's lives than someone else's judgment that they are no longer worth their keep. It is then, when the answer at the hiring gate is "You're too old," that a man turns away, in [a] poet's phrase, finding "nothing to look backward to with pride, nothing to look forward to with hope."

*Id.* at 1. This discrimination added, in the report's estimation, hundreds of millions of dollars in public expense due to unemployment insurance payments that may not have been necessary. See *id.* at 18.

The Wirtz Report also addressed earlier voluntary efforts like "studies, information and general education" campaigns directed at ending the "persistent and widespread use of age limits in hiring." *Id.* at 21. The "possibility of new *nonstatutory* means of dealing with such arbitrary discrimination has been explored," the report declared, and as of the time of the report, "[t]hat area is barren." *Id.* Some states had moved ahead and enacted "statutes prohibiting discrimination in employment on the basis of age," and their success suggested the primary solution—for the federal government to adopt "a national policy with respect to hiring on the basis of ability rather than age" that would not be subsumed into other anti-discrimination efforts. *Id.* at 21–22; see also *General Dynamics*, 540 U.S. at 587 (explaining that arbitrary employment distinctions "including … age ceilings on hiring" helped inspire the "call for a federal legislative remedy"). That national policy was, of course, adopted in the ADEA. The Wirtz Report and the ADEA are as much about the unfairness

of the *hiring* market for unemployed older workers as about anything else.

To adopt the defendant's reading of paragraph (a)(2), we would have to find that the ADEA's protection of the "employment opportunities" of "any individual" prohibits employment practices with disparate impacts in firing, promoting, paying, or managing older workers, *but not in hiring them*. Congress, as shown by both the Wirtz Report itself and later interpretations of it, was indisputably concerned about all of these forms of discrimination. Wirtz Report at 21–22; see also *Employment of Older Workers*, 111 Cong. Rec. 15518, 15518–19 (1965) (describing Wirtz Report as urging "a clear, unequivocal national policy against hiring that discriminates against older workers" and referring to "job openings," and "applicants over 45"); *EEOC v. Wyoming*, 460 U.S. at 231 (observing that Wirtz Report concluded "arbitrary age discrimination was profoundly harmful … [because] it deprived the national economy of the productive labor of millions … [and] substantially increased costs in unemployment insurance and federal Social Security benefits" for older workers who could not land a job).

These signals from the Wirtz Report help reveal the assumptions that the ADEA's "authors entertained about how their words would be understood." *Sinclair*, 870 F.2d at 1342. A central goal—arguably *the* most central goal—of the statute was to prevent age discrimination *in hiring.* And Congress and the Wirtz Report made clear that the problem stemmed not just from explicit bias against older workers (i.e., disparate treatment), but also from "[a]ny formal employment standard" neutral on its face yet with adverse effects on otherwise qualified older applicants. Wirtz Report at 3; see

also *Smith*, 544 U.S. at 235 n.5. Those neutral standards and other thoughtless (or even well-intentioned) employment policies and practices can be addressed only with a disparate impact theory under § 623(a)(2). In fact, the Wirtz Report singled out seniority systems and employer policies of promoting-from-within as well-intentioned but harmful to older workers. Wirtz Report at 2, 15. And the report made clear that the older people who suffer the disparate impact from such practices are *those trying to get hired in the first place*. The report explained that despite the beneficial effects of such policies, "ironically, they sometimes have tended to push still further down the age at which employers begin asking *whether or not a prospective employee is too old to be taken on*." *Id.* at 2 (emphasis added).

Against this evidence of contemporary understandings, the defendant offers essentially nothing to support the improbable view that the Act outlawed employment practices with disparate impacts on older workers, but limited that protection to those already employed by the employer in question. To the extent § 623(a)(2) could be considered ambiguous on the issue, the evidence of purpose weighs heavily in favor of allowing disparate impact claims by job applicants regardless of whether they come from inside or outside the company. Outside job applicants are a very large group of the ADEA's intended beneficiaries, and they are protected by the text of both its disparate treatment and disparate impact provisions.

III. *Comparisons and Precedent Regarding the Language of § 623(a)(2)*

With that understanding of the text, the practical consequences of the parties' alternative readings of paragraph

(a)(2), and the report that was the catalyst for the Act, we return to paragraph (a)(2)'s language and examine it in light of related statutory provisions and past judicial interpretations. The parties draw our attention to the following circumstances. First, Title VII's parallel provision is now slightly different because it was amended in 1972 to add "or applicants for employment" after *Griggs v. Duke Power Co.*, 401 U.S. 424 (1971). Second, nearby provisions of the ADEA refer more directly to job applicants. Third, a 1994 decision of our court, since abrogated by *Smith v. City of Jackson*, 544 U.S. 228 (2005), categorically rejected disparate impact theories under the ADEA. None of these points changes our conclusion, drawn from statutory text, practical consequences, purpose, and history, that the ADEA's disparate impact provision protects both inside and outside job applicants.

A. *The Title VII Parallel*

1. *Differences Between Today's Title VII and the ADEA*

Section 623(a)(2) tracks very closely a parallel provision for race, sex, religious, and national origin discrimination in Title VII of the Civil Rights Act of 1964, with one notable difference—an explicit reference to job applicants. Title VII now provides in relevant part:

It shall be an unlawful employment practice for an employer—

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of

such individual's race, color, religion, sex, or national origin; or

(2) to limit, segregate, or classify his employees *or applicants for employment* in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C. § 2000e–2(a) (emphasis added).

On the surface, it would seem easy to argue that the language difference between the disparate impact provisions in Title VII and the ADEA shows different meaning with respect to job applicants. The problem with that argument is that the "or applicants for employment" language was added to Title VII in 1972, *after* the Supreme Court decided *Griggs v. Duke Power*, 401 U.S. at 431, which recognized disparate impact claims for practices affecting both outside job applicants and employees seeking promotions and transfers. When *Griggs* was decided, the statutory language in Title VII was the same as the language we examine here—it did not include the phrase "applicants for employment." See 401 U.S. at 426 n.1, quoting original version of § 2000e–2(a). That's why *Smith* described *Griggs* as "a precedent of compelling importance" in interpreting § 623(a)(2). 544 U.S. at 234. In *Griggs*, the Supreme Court held unanimously that the disparate impact provision in Title VII applied to job applicants.

In *Griggs*, the employer required either a high school diploma or a minimum score on a general intelligence test to screen all job applicants, whether they were outside

applicants or current employees seeking better jobs. The Court framed the issue as whether an employer could require a high school education or passing a general intelligence test as "a condition of employment in or transfer to jobs," 401 U.S. at 426, signaling that the disparate impact provision applied to both current employees and outside job applicants. The opinion also referred to the "*hiring* and assigning of employees" and to "tests or criteria for *employment* or promotion." *Id.* at 427, 431 (emphasis added). Even more clearly, the Court wrote:

> Congress has now provided that tests or criteria for employment or promotion may not provide equality of opportunity merely in the sense of the fabled offer of milk to the stork and the fox. On the contrary, Congress has now required that the posture and condition *of the job-seeker* be taken into account. It has—to resort again to the fable—provided that the vessel in which the milk is proffered be one *all seekers* can use. The Act proscribes not only overt discrimination but also practices that are fair in form, but discriminatory in operation.

*Id.* at 431 (emphasis added). There is no sign in the *Griggs* opinion that the Court saw a relevant difference between current employees seeking a promotion or transfer and job applicants from outside the company.

2.  *Griggs and the 1972 Amendment to Title VII*

The conclusion in *Griggs* was not altered by the 1972 amendment to Title VII. The year after *Griggs*, Congress enacted the Equal Employment Opportunity Act of 1972. It was a major bill that strengthened the powers of the EEOC

and extended coverage of Title VII to state and local government employees, teachers, and federal employees. See Conf. Rep. on H.R. 1746, reprinted in 92nd Cong., 118 Cong. Rec. 7166, 7166–69 (March 6, 1972). One minor provision of the 1972 Act amended Title VII's § 2000e-2(a)(2) to add the express reference to "applicants for employment." Pub. L. No. 92-261, § 8(a), 86 Stat. 109 (1972). There was no indication, though, that the particular amendment was intended to change the law as spelled out in *Griggs*. In fact, the conference committee's report to the Senate explained that the addition in § 8(a) was "merely declaratory of present laws." See 118 Cong. Rec. at 7169. Congress included this subsection just to "make it clear that discrimination against applicants for employment … is an unlawful employment practice" under both clauses of Title VII's § 2000e-2(a). 118 Cong. Rec. at 7169.[4]

Confirming that point, the key committee reports do not discuss § 8(a) as a significant provision. If Congress had thought it was creating new law by extending disparate impact protection from current private-sector employees to reach all private-sector job applicants as well, that surely would have been significant enough to mention in the

---

[4] This conference committee report to the Senate was the final report on § 8(a) of H.R. 1746, which added "or applicants for employment" to 42 U.S.C. § 2000e-2(a)(2). See 86 Stat. 103, 109 (approved March 24, 1972). The conference report essentially repeated an earlier Senate report from the previous October that said the § 8(a) and (b) amendments would "make it clear that discrimination against applicants for employment … is an unlawful employment practice" and also that these particular amendments "would merely be declaratory of present law." S. Rep. 92–415 at 43 (Oct. 28, 1971). That earlier Senate report mentioned *Griggs*, though only in passing in a different section about federal government employment. See *id.* at 14.

committee reports. The Senate reports contained the brief "merely declaratory" description of § 8(a) explained above. The House version of the conference committee report from a few days before contained the text of § 8(a) but provided no explanation of it. See H.R. Rep. 92–899 at 8, 19–20, reprinted in 92nd Cong., 118 Cong. Rec. 6643, 6645, 6648 (March 2, 1972). An earlier House report summarized the bill's major provisions, which were directed at different issues. H.R. Rep. 92–238 at 1, 4 (June 2, 1971), reprinted in 1972 U.S.C.C.A.N. 2137, 2137, 2140 (explaining the "basic purpose of H.R. 1746 is to grant the Equal Employment Opportunity Commission authority to issue … judicially enforceable cease and desist orders" as well as to extend protections to State and local government employees, Federal employees, and private-sector employees and labor union members at smaller organizations); *id*. at 8–26, reprinted at 2143–60 (summarizing these provisions). With the focus on these other issues, the language in § 8(a) was not mentioned at all in the explanation. It appears only in passing in the section-by-section analysis. See *id.* at 20–22, 30, reprinted at 2155–57, 2165. The explanation quotes *Griggs* at length to emphasize the importance of disparate impact protections for "the job seeker" before noting that the "provisions of the bill are fully in accord with the decision of the Court." *Id.* at 21–22, reprinted at 2156–57, quoting *Griggs*, 401 U.S. at 431.[5]

---

[5] In a different section, the earlier House report reached the same conclusion about *Griggs* that we reach here: it was a case "where the Court held that the use of employment tests as determinants of *an applicant's* job qualification … was in violation of Title VII if such tests work a discriminatory effect in *hiring* patterns" without a "showing of an

As the Supreme Court has taught, Congress "does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes." *Whitman v. American Trucking Ass'ns*, 531 U.S. 457, 468 (2001). In addition, there is no indication from the text of the 1972 Act amending Title VII that Congress intended that Act to serve in any way as a statement about the ADEA. See Pub. L. No. 92-261, 86 Stat. 103–13 (1972).

Nevertheless, the defendant argues that we should infer from this 1972 amendment to Title VII that in clarifying existing Title VII law after *Griggs*, and consistent with it, Congress was silently endorsing a narrower interpretation of the ADEA. This negative inference is not justified. The ADEA was never mentioned in the 1972 Act itself or in the conference report describing it. The 1972 Act was the Equal Employment Opportunity Act of 1972, and it amended *only* provisions of Title VII of the 1964 Act. See *University of Texas Southwestern Medical Center v. Nassar*, 570 U.S. 338, 356 (2013) ("In light of Congress' special care in drawing so precise a statutory scheme [like Title VII], it would be improper to indulge respondent's suggestion that Congress meant to incorporate the default rules that apply only when Congress writes a broad and undifferentiated statute."); *Brown v. Gardner*, 513 U.S. 115, 121 (1994) (finding that "congressional silence" after regulatory interpretation lacked "persuasive significance" about statutory meaning), quoting *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 187 (1994).

---

overriding business necessity." H.R. Rep. 92–238 at 8, reprinted at 1972 U.S.C.C.A.N. at 2144 (emphasis added).

### 3. *Applying Griggs in This Context*

In fact, *Griggs* has special and continuing relevance to the ADEA in this context. When the Supreme Court held in *Smith v. City of Jackson* that § 623(a)(2) authorizes disparate impact claims, the Court relied heavily on the *Griggs* interpretation of the essentially identical language from Title VII before the 1972 amendments. 544 U.S. at 234–37. *Smith* also cited with approval circuit decisions allowing disparate impact age claims *by job applicants*. See 544 U.S. at 237 n.8, citing with approval *Faulkner v. Super Valu Stores, Inc.*, 3 F.3d 1419, 1423–24 (10th Cir. 1993) (group of laid-off grocery warehouse workers applying for jobs with new employer); *Wooden v. Board of Education of Jefferson County*, 931 F.2d 376, 377 (6th Cir. 1991) (applicant for full-time teaching positions).

Other earlier cases not cited in *Smith* had also allowed disparate impact age claims by job applicants. E.g., *Lowe v. Commack Union Free School Dist.*, 886 F.2d 1364, 1365–70 (2d Cir. 1989) (laid-off teachers later re-applied but not hired); *Geller v. Markham*, 635 F.2d 1027, 1030 (2d Cir. 1980) (upholding jury award for teacher applicant temporarily hired, then passed over in favor of 25-year-old due to "cost-cutting policy"); *Leftwich v. Harris-Stowe State College*, 702 F.2d 686, 689–90 (8th Cir. 1983) (faculty member forced to re-apply for job not rehired).

In addition, around the time of these earlier cases, the Supreme Court cited with approval another circuit's approach to an ADEA claim involving job applicants. *Western Air Lines, Inc. v. Criswell*, 472 U.S. 400, 412–17 (1985), discussing *Usery v. Tamiami Trail Tours, Inc.*, 531 F.2d 224 (5th Cir. 1976). The employer in *Tamiami Trail* considered applications only from people between 25 and 40 years of age, the idea being "that

dealing with each applicant over 40 years of age on an individual basis by considering his particular functional ability… would be impractical." *Tamiami Trail*, 531 F.2d at 227–28. The *Tamiami Trail* court did not specify whether this no-applicants-over-40 policy violated § 623(a)(1), § 623(a)(2), or both, but the Secretary of Labor, representing those aggrieved by the policy, challenged both the policy itself and its application to particular job-seekers. See *id.* at 226–27, 226–27 n.1 & n.2. In approving of the "*Tamiami* standard" for the bona fide occupational qualification defense, the Supreme Court accepted without comment the notion that Tamiami Trail's hiring policy ran afoul of § 623(a) absent other statutory justifications. See *Western Air Lines*, 472 U.S. at 416–17; see also *Hodgson v. Greyhound Lines, Inc.*, 499 F.2d 859, 860, 863, 865 (7th Cir. 1974) (undertaking similar analysis of Secretary's claim brought under both (a)(1) and (a)(2), and eventually concluding that employer had "established that its hiring policy is not the result of an arbitrary belief lacking in objective reason or rationale"). Given all the variations on the employee-v.-applicant question presented by these circuit cases in the decades between *Griggs* and *Smith*, we believe that if the distinction the defendant urges here actually existed, the Supreme Court would have mentioned it.

The defendant responds to the *Griggs* argument in two principal ways. First, it returns to *Griggs* itself to argue all of its plaintiffs were in fact already employed by Duke Power and were only seeking better jobs. So, according to the defendant, *Griggs* is limited to fact patterns involving incumbent employees. We are not persuaded. Even if the *Griggs* plaintiffs themselves were already employees, the Supreme Court did not limit its holding in *Griggs* to that particular fact pattern, as we explained above. The Court saw

no reason to read the paragraph (a)(2) language in Title VII as allowing discriminatory tests for hiring while outlawing them for promotion decisions.[6]

B. *Our Precedent Abrogated by Smith*

Second, the defendant argues that a 1994 decision of this court, which categorically rejected all disparate impact claims under the ADEA, still survives today, at least in part. See *E.E.O.C. v. Francis W. Parker School*, 41 F.3d 1073, 1078 (7th Cir. 1994). The parties agree that the approach in *Francis Parker School* was abrogated in *Smith*, which resolved a circuit split and held that § 623(a)(2) allows disparate impact claims. 544 U.S. at 237, 237 nn.8 & 9. *Smith* concluded in a case brought by employees that "the ADEA does authorize recovery in 'disparate-impact' cases comparable to *Griggs*." *Id.* at 232. But because the plaintiff in *Francis Parker School* was a job applicant and not an employee, the defendant argues here that enough of *Francis Parker School* survives to defeat Kleber's disparate impact claim. See 41 F.3d at 1075, 1077–78.

We first describe these three cases before explaining why *Smith* and not *Francis Parker School* controls this case. In *Francis Parker School*, a sixty-three year old's application for a teaching job was not considered because, based on his experience, he would have qualified for a salary higher than the school could

---

[6] The defendant makes a similar argument about *Smith v. City of Jackson*, whose plaintiffs were also incumbent employees. See 544 U.S. at 230 (describing petitioners as "police and public safety officers employed by the city of Jackson, Mississippi" who complained of allegedly discriminatory "salary increases received in 1999"). This argument fails for largely the same reason. Though *Smith* did not expressly address the employee-v.-applicant question, nothing in the controlling opinions in *Smith* indicates that its reasoning does not extend to job applicants.

afford. 41 F.3d at 1075. Without actually confirming with the applicant that his salary requirements would indeed be too high, the school moved ahead with other candidates. On behalf of the applicant, the EEOC appealed summary judgment in favor of the school. We affirmed, adopting a categorical rule rejecting disparate impact claims under the ADEA. *Id.* at 1075–77, 1078.[7]

As we describe above at pages 21–23, *Griggs* involved the "hiring and assigning of employees" at a power plant operated by Duke Power. 401 U.S. at 427. The company had imposed educational and testing "requirement[s] for new employees" and transferring employees seeking employment in more preferable divisions. *Id.* at 427–28. Although the *Griggs* plaintiffs themselves already worked at the plant, the Supreme Court did not limit its analysis in light of that fact. The Court explained more generally that "tests or criteria *for employment or promotion*" could be challenged if they were "fair in form, but discriminatory in operation." *Id.* at 431 (emphasis added).

Faced with a case brought by municipal employees, the *Smith* Court applied *Griggs* to the identical language of the ADEA and held "that the ADEA does authorize recovery in 'disparate-impact' cases comparable to *Griggs*." 544 U.S. at 232. Thus the key question is whether a case involving an

---

[7] We found support for this position in a then-recent Supreme Court opinion. See *Francis Parker School*, 41 F.3d at 1076–78, discussing *Hazen Paper Co. v. Biggins*, 507 U.S. 604 (1993). Eleven years later *Smith* rejected the argument, concluding that "there is nothing in our opinion in *Hazen Paper* that precludes an interpretation of the ADEA that parallels our holding in *Griggs*." 544 U.S. at 238.

outside job applicant is "comparable to *Griggs*," and thus eligible for disparate impact recovery. See *id.* at 232.

The defendant and courts taking the defendant's view respond by arguing that *Griggs* should be narrowed to "transferees" inside of companies, i.e., internal applicants, primarily by citing brief mentions of *Griggs* in later opinions. See Appellee Br. at 26–28; see also *Villarreal v. R.J. Reynolds Tobacco Co.*, 839 F.3d 958, 969 (11th Cir. 2016) (en banc) (finding that *Griggs* addressed only "promotion and transfer policies"). In passing in some later opinions, the Supreme Court used the terms "employees" or "transferees" while succinctly outlining the mechanics of Duke Power's complicated testing policy. E.g., *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 426 (1975) (in *Griggs*, "all transferees … were required to attain national median scores on two tests").

These later opinions, however, did not try to limit the holding of *Griggs* to cases involving current employees, nor did they lose sight of the broader implications that *Griggs* had for future plaintiffs. See, e.g., *id.* at 427 ("Like the employer in *Griggs*," the paper company defendant required "[a]pplicants for hire" to achieve certain test scores); *id.* at 425 (after *Griggs*, the "complaining party or class" must show "that the tests in question select *applicants for hire* or promotion in a racial pattern") (emphasis added). Nor do these later references undermine the signals *Griggs* sent about the sweeping implications of its reasoning for the hiring process nationwide. See 401 U.S. at 434 ("the very purpose of title VII is to promote hiring on the basis of job qualifications, rather than on the basis of race or color"), quoting 110 Cong. Rec. 7247 (1964); *id.* at 434–35 n.11 (to that end, "nothing in the Act prevents employers from requiring that *applicants* be fit for the

job") (emphasis added). The holding and reasoning in *Griggs* were not narrow and focused on those particular plaintiffs; the opinion is broad and effects-oriented. See, e.g., *id.* at 429–31 ("Congress has now required that the posture and condition of the job-seeker be taken into account … [i]f an employment practice which operates to exclude Negroes cannot be shown to be related to job performance, the practice is prohibited."). Limiting *Griggs* to its facts is not justified.

The Supreme Court itself has repeatedly rejected that narrow approach. *Smith* recognized the import of *Griggs* for the ADEA when it explained paragraph (a)(2)'s text as focusing on "the *effects* of the action" and not the employer's motivations. 544 U.S. at 234, 236. Perhaps most important, in recognizing that the "scope of disparate-impact liability under ADEA is narrower than under Title VII," the Supreme Court did not mention *Griggs* at all. See *id.* at 240–43. Nor did it later find an inside-v.-outside applicant limiting principle in *Griggs* when that case's limits were examined in a Fair Housing Act case. See *Texas Dep't of Housing and Community Affairs v. Inclusive Communities Project, Inc.*, 135 S. Ct. 2507, 2517 (2015) (discussing business necessity defense and "hiring criteria"); see also *Connecticut v. Teal*, 457 U.S. 440, 446 (1982) (although requirements in *Griggs* "applied equally to white and black employees and applicants, they barred employment opportunities to a disproportionate number of blacks" and were therefore invalid); *Dothard v Rawlinson*, 433 U.S. 321, 329 (1977) (explaining that *Griggs* and *Albemarle Paper* "make clear that to establish a prima facie case of discrimination, a plaintiff need only show that the facially neutral standards in question select applicants for hire in a significantly discriminatory pattern").

Thus, since *Smith* resolved the disparate impact question on the basis of *Griggs*, and since *Griggs* was about both promotion *and* hiring criteria, this hiring case is "comparable to *Griggs*" and controlled by it, without reference to *Francis Parker School*. See *Smith*, 544 U.S. at 232.[8]

C. *Comparing § 623(a)(2) to Other ADEA Provisions*

1. *Summary*

The parties also offer textual arguments that compare § 623(a)(2) to several neighboring provisions in the ADEA. The unlawful employment practices section of the ADEA begins with three subsections prohibiting age discrimination in employment by three different kinds of actors—private and public employers, employment agencies, and labor organizations. 29 U.S.C. § 623(a)–(c); see also § 630(b)

---

[8] There is another reason why *Francis Parker School* does not control this case—it had a subtle factual error in its discussion of *Griggs*. In rejecting the reasoning in *Griggs*, the *Francis Parker School* opinion characterized *Griggs* as interpreting 42 U.S.C. § 2000e-2 as it existed in 1994. See 41 F.3d at 1077–78. This observation overlooked the timing of *Griggs*, decided in 1971, *before* the Title VII language was changed in 1972 to expressly include applicants for employment. Compare 42 U.S.C. § 2000e-2(a)(2) (1994), with *Griggs*, 401 U.S. at 426 n.1 (1971). *Francis Parker School* found this textual difference between the ADEA and Title VII meaningful because it assumed that *Griggs* had applied 1994's Title VII. But in fact, *Griggs* interpreted the same language at issue in *Francis Parker School* and here—which does not refer expressly to job applicants—so *Griggs* has special persuasive force in this analysis. Compare *Griggs*, 401 U.S. at 424 n.1, with 29 U.S.C. § 623(a)(2) (2016). In any event, *Griggs* is now settled law in the ADEA context given its treatment in *Smith* and the later treatment of *Smith* in *Meacham v. Knolls Atomic Power Lab.*, 554 U.S. 84, 95 (2008) (confirming that § 623(a)(2) covers employment practices with disparate impacts on older workers). We must apply that reasoning here. See *Inclusive Communities Project*, 135 S. Ct. at 2518.

(defining "employer"). Subsections (a), (b), and (c) are all worded slightly differently. In the following subsection (d), the ADEA prohibits retaliation by any of these private-sector actors. In another section, the ADEA provides for a different and even broader policy prohibiting age discrimination in the federal government employment context. § 633a(a).

Remember that the text of § 623(a)(2)—the provision we interpret here—does not specifically include or obviously exclude applicants for employment in such terms. Some other ADEA provisions do use the term "applicant(s) for employment." See §§ 623(c)(2), 633a(a). The question is whether the absence of this phrase in the private employer-facing provisions of (a)(2) is meaningful. See *Brown*, 513 U.S. at 118–19 (engaging in "[t]extual cross-reference" to ascertain meaning).

The three comparisons from within the ADEA are the labor union provision in § 623(c)(2), the retaliation provision in § 623(d), and the federal government employee provision in § 633a(a). Here again is the text of § 623(a)(2):

> It shall be unlawful for an employer—…
>
> (2) to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's age… .

The labor union provision prohibits labor unions from refusing "to refer for employment any individual" and from adversely affecting the status of any "applicant for employment, because of such individual's age." § 623(c)(2). The retaliation provision makes it unlawful for "an employer

to discriminate against any of his employees or applicants for employment" in retaliation for opposing unlawful practices or participating in the investigation or litigation of an age discrimination complaint. § 623(d). Finally, the federal government employee provision declares that "[a]ll personnel actions affecting employees or applicants for employment … shall be made free from any discrimination based on age." § 633a(a).

Courts often presume that a difference in statutory words signals a difference in Congressional intent, but we must consider here "whether Congress intended its different words to make a legal difference." *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 62–63 (2006) (comparing the limiting words in Title VII's anti-discrimination provision with the lack of limiting words in its broader anti-retaliation provision). The conclusion does not follow automatically from any difference in words. We need some basis beyond simple word-matching to believe that these particular differences in language were intended to distinguish the ADEA's disparate impact provision from these other provisions.

In construing workplace discrimination laws, "Congress' special care in drawing so precise a statutory scheme" must be respected, and courts should exercise caution in drawing inferences between provisions that have different scopes. *Nassar*, 570 U.S. at 356. The Supreme Court has rejected similar arguments for such sweeping negative inferences about the ADEA itself, noting that "when construing the broadly worded federal-sector provision of the ADEA, [the] Court refused to draw inferences from Congress' amendments to the detailed private-sector provisions." *Id.*,

describing *Gomez-Perez v. Potter*, 553 U.S. 474, 486–88 (2008). We should not draw these inferences too readily.

2. *The Labor Union Provision*

Interpreting the ADEA, the Court has also said that "[n]egative implications raised by disparate provisions are strongest" when those provisions were "considered simultaneously" or enacted at the same time. *Gomez-Perez*, 553 U.S. at 486, quoting *Lindh v. Murphy*, 521 U.S. 320, 330 (1997). Meeting that description is the comparison of § 623(a)(2) with the labor union provision, § 623(c). See Pub. L. 90-202, § 4, 81 Stat. 603 (1967). They were enacted together and are close to each other. But on closer examination, the labor union provision's phrase "refuse to refer for employment any individual" stands out. This change in language reflects an important substantive difference. Unlike most private employers, labor organizations often serve as referral agencies of sorts for job applicants, especially in markets where union membership may be a condition of employment. Under the original ADEA definition, one way a labor organization would fall under its coverage would be to "operate[] a hiring hall or hiring office which procures employees for an employer." *Id.* at § 11(e), 81 Stat. 606, codified at 29 U.S.C. § 630(e). The fact that Congress included special, detailed language in (c)(2)—prohibiting a labor organization from adversely affecting an individual's status "as an applicant for employment"—to reflect a special function of labor organizations tells us little about what the

broader private sector (a)(2) language means in light of *Nassar* and *Gomez-Perez*.[9]

### 3. *Retaliation Provision*

The defendant also urges us to compare the disparate impact provision in (a)(2) with the ADEA's retaliation provision, § 623(d). The retaliation provision was enacted at the same time as (a)(2) and makes it "unlawful for an employer to discriminate against any of his employees or applicants for employment" as a consequence of their opposition to unlawful practices or their involvement in the

---

[9] Also, using this language to infer that private employers are permitted to use practices with disparate impacts on older job applicants would create a strange incongruity in the statute. All actors who regularly recruit job applicants are specifically prohibited from engaging in age discrimination. In 1967, Congress made it unlawful "for an employment agency to fail or refuse to refer for employment, or otherwise to discriminate against, any individual because of such individual's age, or to classify or refer for employment any individual on the basis of such individual's age." See 29 U.S.C. §§ 623(b) and 630(c) (defining "employment agency" as "any person regularly undertaking with or without compensation to procure employees for an employer"); see also Pub. L. 90-202, §§ 4(b), 11(c), 81 Stat. 603, 606 (1967) (enacting these provisions). To rule for the defendant on this ground, we would have to conclude that the ADEA prohibits labor unions from imposing disparate impacts on applicants, and prohibits anyone else who recruits employees from "classify[ing]" applicants based on age, yet allows private employers to use screening criteria to the detriment of older applicants as long as they handle the applications themselves. This would be an odd reading, especially in light of the Wirtz Report and the rest of the original section 4, where Congress showed an intent to group employers, employment agencies, and labor organizations together with respect to retaliation, job advertisements, and the use of bona fide occupational qualifications and reasonable factors other than age. See Pub. L. 90-202, § 4(d)–(f), 81 Stat. 603 (1967).

age discrimination complaint and resolution process. Pub. L. 90-202, § 4(d), 81 Stat. 603 (1967), codified at 29 U.S.C. § 623(d).

This provision refers to applicants for employment as distinct from employees, but the comparison fails to shed light on the meaning of paragraph (a)(2) specifically. First, it is not clear that the enumeration in subsection (d) does anything more than recognize that subsection (a) as a whole unquestionably covers both employees and applicants— paragraph (a)(1), of course, makes it unlawful for an employer "to refuse to hire or to discharge any individual," and we have explained why (a)(2) applies to job applicants. Subsection (d) extends retaliation protection to the same groups without any obvious reference to the disparate impact provision of paragraph (a)(2).

If it suggests anything useful here, the language in subsection (d) suggests that the key phrase in paragraph (a)(2) is the broad "any individual." Later in the retaliation provision, perhaps as a shorthand, subsection (d) repeats the phrase "individual, member or applicant for membership" twice, signaling in the provision that "individual" is the key unit of analysis for retaliation by private sector employers and employment agencies. See § 623(d); see also *Sauzek v. Exxon Coal USA, Inc.*, 202 F.3d 913, 918 (7th Cir. 2000) (noting that § 623(d) is directed at "any individual" in retaliation and failure-to-rehire case).

Second, the retaliation provision is notable for what it does not say. The defendant's no-outside-applicants view would find strength from this provision if it called out paragraph (a)(2) specifically and if it prevented retaliation against "any of his employees or *internal* applicants for employment," or if

it read "any of his employees or applicants for *promotion or transfer*." It does not say anything to that effect, however. The plain text of the ADEA's retaliation provision covers employees and applicants, which as we describe above, is the best way to understand the scope of paragraph (a)(2) as well.

### 4.  *The Federal Employee Provision*

With respect to the federal employee provision, as in *Gomez-Perez*, the "relevant provisions were not considered or enacted together." 553 U.S. at 486. The federal employee provision was added to the ADEA in 1974. Pub. L. 93-259, § 15(a), 88 Stat. 74–75 (1974), codified at 29 U.S.C. § 633a(a).

The federal employee reference to applicants, added at a different time, tells us little about what the original ADEA (a)(2) language means. *Gomez-Perez* indicates that the natural comparator for ADEA's federal government employee provision is not § 623(a) but the federal government employee provision of Title VII, upon which the 1974 ADEA amendments were based. See *Gomez-Perez*, 553 U.S. at 487, discussing 29 U.S.C. § 633a and 42 U.S.C. § 2000e-16(a). "Congress decided not to pattern [ADEA's federal government employee provision] after § 623(a) but instead to enact a broad, general ban on 'discrimination based on age'" like the Title VII federal-sector provision. *Id.* at 488. The Supreme Court thus told us that Congress was not thinking of the private sector language in § 623(a)(2) when § 633a was adopted, which undermines the negative inference that the defendant seeks to draw from the comparison.

### D.  *Conclusion*

Given the statutory language in § 623(a)(2), the interpretation of that language in *Smith* and virtually identical

language in *Griggs*, and the absence of an apparent policy rationale for barring outside job applicants from raising disparate impact claims, we are not persuaded by the defendant's more subtle comparative arguments using various other statutory provisions. Those differences do not support the improbable and arbitrary distinction argued by the defendant.

IV. *Exhaustion of Administrative Remedies*

Finally, defendant CareFusion offers an alternative argument for affirmance. In the district court, the defendant moved to dismiss the disparate impact claim on the additional ground that Kleber failed to exhaust his administrative remedies. It argued that Kleber's EEOC charge could not have notified the company that he alleged a practice of discrimination against older workers since he charged that "*I* was not hired" and therefore "*I* have been discriminated against because of my age, 58." Dkt. 22–1 at 8 (emphasis added). The defendant renews this exhaustion argument on appeal, but it is misplaced.

To be cognizable, ADEA claims must be "like or reasonably related to the allegations of the charge and growing out of such allegations." *Noreuil v. Peabody Coal Co.*, 96 F.3d 254, 258 (7th Cir. 1996), quoting *Jenkins v. Blue Cross Mutual Hosp. Ins., Inc.*, 538 F.2d 164, 167 (7th Cir. 1976) (en banc). Kleber's charge could reasonably have prompted CareFusion to consider the possible systemic effects of its hard cap on experience, and in fact it did so. In its response to the EEOC, appearing on the same page as a verbatim reprint of Kleber's allegation, CareFusion asserted that "the years of experience required has nothing to do with an individual's age." Dkt. 22–1 at 20. It highlighted the possibility that a

middle-aged individual could have "attended law school as a second career" and then applied with between three and seven years of experience. *Id.* Such an applicant "would have been considered for the role." *Id.* The argument shows that CareFusion's investigation of Kleber's charge explicitly considered the age-related effects of screening applicants based on maximum experience. Kleber's EEOC charge gave sufficient notice of his disparate impact claim.

*Conclusion*

Plaintiff Kleber is over the age of 40. Kleber alleges that his job application was not considered because of a specific hiring practice that discriminated in effect against older applicants like him. Neither the language of § 623(a)(2) nor our abrogated precedent in *Francis Parker School* bars his disparate impact claim. The judgment of the district court is REVERSED and the case is REMANDED to the district court for further proceedings consistent with this opinion.[10]

---

[10] Because this opinion could be seen as creating a conflict among the circuits, despite *Smith*, 544 U.S. at 237 n.8 (citing with approval earlier circuit cases allowing disparate impact claims by job applicants), it was circulated before release to all judges in active service under Circuit Rule 40(e). A majority of judges in active service did not favor rehearing en banc. Judges Flaum, Kanne, Sykes, and Barrett voted in favor of rehearing en banc.

Bauer, *Circuit Judge,* dissenting. I believe an ordinary reading of the language found in § 4(a)(2) of the Age Discrimination in Employment Act of 1967 (ADEA), 29 U.S.C. § 623(a), affirms the district court's findings. This Court's reversal is an erroneous form of statutory interpretation that requires writing in words that Congress chose not to include. *See Puerto Rico v. Franklin Cali. Tax-Free Trust*, 136 S. Ct. 1938, 1949 (2016) ("[O]ur constitutional structure does not permit this Court to rewrite the statute that Congress has enacted.") (internal quotation marks omitted). While the judicial branch is afforded the duty of determining the constitutionality of statutes enacted by Congress, we are not afforded the right to pencil in words Congress does not itself include. *See Henson v. Santander Consumer USA Inc.*, 137 S. Ct. 1718, 1725 (2017) ("[W]hile it is of course our job to apply faithfully the law Congress has written, it is never our job to rewrite a constitutionally valid statutory text under the banner of speculation about what Congress might have done had it faced a question that, on everyone's account, it never faced."); *see also Magwood v. Patterson*, 561 U.S. 320, 334 (2010).

"Statutory construction must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose." *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 175 (2009) (internal quotation marks omitted). It is important to keep in mind that "Congress generally acts intentionally when it uses particular language in one section of a statute but omits it in another." *Dep't of Homeland Sec. v. MacLean*, 135 S. Ct. 913, 919 (2015). Throughout the ADEA, Congress specifically used "employees" in some instances and "applicants for employment" in others. For example, § 4(c)(2), which prohibits labor organizations from acting, tracks the language

from § 4(a)(2), but adds "applicants for employment." Similarly, § 4(d), which provides retaliation protections, also extends this protection to "applicants for employment." As the majority opinion admits, § 4(a)(2) does not reference, in any way, "applicants for employment," "prospective employees," "job seekers," or any other terms that would allow us to conclude that Congress intended to cover prospective employees under the disparate impact provision. Conversely, § 4(a)(1) specifically states, "to fail or refuse to hire" due to one's age, thus explicitly implicating job applicants. Given Congress' omission of "applicants for employment" in § 4(a)(2), yet unquestionable inclusion of job applicants in several other places throughout the ADEA, including the section directly preceding § 4(a)(2), I must conclude that Congress intentionally excluded "applicants for employment" in § 4(a)(2) of the ADEA. Accordingly, I respectfully dissent.